1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Joseph Hines,                    :

        Plaintiff,        :

        vs.              : Case No. 2:13-cv-1058

City of Columbus,          :
et al.,
                          :
        Defendants.


- - - - -


DEPOSITION OF GERALD A. SHIENER, M.D.

- - - - -




Taken at 251 Merrill Street, Suite 230
Birmingham, Michigan
Commencing at 5:20 p.m.
Tuesday, February 10, 2015,




- - - - -


Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                          APPEARANCES

2

   ON BEHALF OF THE PLAINTIFF:
3
          HEATHER A. GLAZER, ESQ.
4         CAMERON T. PERALTA, ESQ.
          Fieger Law
5         19390 West Ten Mile Road
          Southfield, Michigan 48075
6         (248) 355-5555
          h.glazer@fiegerlaw.com
7

8  ON BEHALF OF THE DEFENDANTS:

9         WESTLEY PHILLIPS, ESQ.
          TIMOTHY J. MANGAN, ESQ.
10        Assistant City Attorney
          Civil Division
11        77 North Front Street
          Columbus, Ohio 43215
12        (614) 645-6959
          wmphillips@columbus.gov
13        tjmangan@columbus.gov

14

15

16

17

18

19

20

21

22

23

24

3

1                              TABLE OF CONTENTS

2    WITNESS                                        PAGE
       GERALD SHIENER, M.D.
3

4    EXAMINATION
       BY MR. MANGAN:                               4
5
                             EXHIBITS
6

7    EXHIBIT                                         PAGE

8      DEPOSITION EXHIBIT 1                          4

9

10

11

12

13

14

15

16

17

18

19

20

21

22    (Original exhibit returned to Mr. Phillips.)

23

24

4

1                          - - - - -

2                    MARKED BY THE REPORTER:

3                    DEPOSITION EXHIBIT 1

4                          - - - - -

5                    GERALD SHIENER, M.D.,

6     was thereupon called as a witness herein, and

7     after having first been duly sworn to testify to

8     the truth, the whole truth and nothing but the

9     truth, was examined and testified as follows:

10                         - - - - -

11                        EXAMINATION

12    BY MR. MANGAN:

13    Q.          Could you please state your full name

14    and your address?

15    A.          Gerald Alan Shiener, 251 East Merrill

16    Street, Suite 230, Birmingham, Michigan 48009.

17    Q.          Good afternoon, Doctor.  My name is Tim

18    Mangan.  I'm the Assistant City Attorney for the

19    City of Columbus.  I'm here with Wes Phillips

20    today, and we are going to ask you questions about

21    an evaluation and report that you did in this

22    case.  Do you understand that?

23    A.          Good afternoon.  Yes, and I do have

24    that understanding.

5

1  Q.          Okay.  What I'm going to do is I know

2  you have been deposed before, so I'm not going to

3  go through it all.  If you don't understand my

4  question, just let me know.  I will rephrase it.

5  A.          I will do my best.

6  Q.          If you answer my question, I am going

7  to presume you understand it, okay?

8  A.          I will do my best to make sure I don't

9  answer anything I don't understand.

10  Q.          Okay.  I'm going to hand you what I

11  have marked as Exhibit 1.

12  A.          Yes.

13  Q.          Are you familiar with that?

14  A.          I am.

15  Q.          Is that the report that you completed

16  on November 18th, 2014?

17  A.          It's a copy of that report, yes.

18  Q.          Okay.  It was based on your examination

19  of Joseph Hines on November 17th, 2014; is that

20  true?

21  A.          That's correct.

22  Q.          Now, Doctor, I'm going to ask you a

23  bunch of questions about the report, but you saw

24  Joseph Hines on November 17th, 2014, correct?

6

1    A.        I did.

2    Q.        Is that the only time you have ever

3    seen him?

4    A.        It is.

5    Q.        You have not seen him before or since?

6    A.        Not before and not since.

7    Q.        I know that we are going to go through

8    what you reviewed and what you based your opinions

9    on.  Have you reviewed or talked to or done

10   anything else with respect to Joseph Hines other

11   than what you have included in your report?

12   A.        No, I haven't.

13   Q.        Doctor, I just want to clarify one

14   thing.  Were you contacted by Joseph Hines'

15   attorneys in order to do an evaluation and report?

16   A.        I was.

17   Q.        Okay.  And you understand that it was,

18   in part, with respect to litigation that was

19   occurring that Joseph Hines had brought?

20   A.        I understood that there was some

21   possibility that litigation would be involved.

22   Q.        Okay.

23   A.        I didn't know the status of the

24   litigation.

1   Q.          Who contacted you?

2   A.          Probably Miss Glazer's secretary or

3   maybe Mr. Harrington's secretary.

4   Q.          Joseph Hines didn't contact you to set

5   up the appointment or anything, did he?

6   A.          No, he didn't.

7   Q.          I just wanted to -- the first paragraph

8   of your report, I just want to clarify.  It says

9   there that "he," meaning Joseph Hines, "consulted

10  me for difficulties he had been experiencing after

11  he was assaulted on August 29th, 2012."  Do you

12  see that?

13  A.          I do.

14  Q.          Isn't it true though that you were

15  actually doing this as an evaluation and report

16  for the possibility of litigation?

17  A.          Well, we have already established that,

18  but the reason he consulted me was for that

19  difficulty of living.

20  Q.          Okay.  But you don't --

21  A.          He didn't come in and say my attorney

22  just told me to come here.  He told me he had been

23  struggling since the police beating.

24  Q.          But the attorney was the one that

1   contacted you?

2   A.          I have already said that.

3   Q.          You don't include that in your report,

4   do you?

5   A.          Who called to make the appointment?  I

6   wouldn't typically do that.

7   Q.          There is nothing in the report that

8   reflects that you were consulted by the attorney

9   in order to do an evaluation and report possibly

10  related to a litigation; is that correct?

11  A.          Well, I mean it is addressed to the

12  attorney.  I'm not sure what else I could do.

13  Q.          But is there any reason why you didn't

14  put that in the body of your report, what you were

15  consulted about?

16  A.          I told you.  I was consulted because

17  this young man had been struggling since he was

18  assaulted on August 29th, 2012.

19  Q.          Now, when you say assaulted, are you

20  using it as a legal term?

21  A.          No.  I'm using it as a layman would.

22  I'm not a lawyer.

23  Q.          The only thing you knew about the

24  incident is what Joseph Hines told you about?

9

1    A.        Well, let me just answer it this way

2    and see if this clears up your understanding.  I

3    took a history.  The history came from the

4    patient.  That is the history he provided me.  I

5    did have some collateral documents, numbers one

6    through five, and then I had a conversation with

7    his mother and father, collateral history, but

8    they weren't there during this incident, so I

9    didn't really take a history of the incident from

10   them.

11   Q.        It's fair to say, Doctor, you did not

12   do an independent investigation of the incident

13   that is at issue, did you?

14   A.        That would really be beyond the scope

15   of what I was asked to do.  I didn't conduct my

16   own police type investigation of what happened.  I

17   just took a history from the patient and made a

18   diagnosis and reviewed some collateral medical

19   information and took some background collateral

20   history from his mom and dad.

21   Q.        So when you use the term "assault," you

22   are not sure what happened that day other than

23   what Joseph Hines told you?

24   A.        Well, that is history.  History comes

1    from the patient.  When I use the term "assault,"

2    I'm not using it as a judge might or a police

3    officer might or as an attorney might.

4    Q.          Isn't it true when he told you that he

5    doesn't remember much of the incident, the actual

6    incident that occurred, does he?

7    A.          He told me he had some impaired

8    recollection, but I think that there is some

9    reasonable inferences that can be made from the

10   description of his condition at the time he was

11   admitted to the hospital.

12   Q.          Okay.  But you don't know what he did

13   or what the police officers did?

14   A.          No, I didn't see what happened.

15   Q.          Right.

16   A.          I will defer that to the finder of fact

17   in this matter.

18   Q.          And just to go through your report, you

19   spoke to Joseph Hines and obtained a history from

20   him, which is pretty much pages 1, 2 and 3 of your

21   report, correct?

22   A.          With the exception that there are some

23   parts of those pages where I think I speak to what

24   the mom told me and what the dad told me.

1  Q.          I think you do later in your report,

2  Doctor.

3  A.          That could be.  That may be under

4  review of documentation.

5  Q.          I'm just trying to get the format.

6  A.          Sure.

7  Q.          Then you also indicate that you

8  reviewed records from Allegiance Health, an MRI on

9  the first page?

10 A.          Yes.

11 Q.          Grant Medical Center records,

12 University of Michigan records, Dr. Corey --

13 A.          Yes.

14 Q.          -- University of Michigan neuropsych

15 records and the Ohio State University records as

16 it relates to therapy; is that correct?

17 A.          That's right.

18 Q.          You didn't review any other documents

19 other than those listed there?

20 A.          If I had, I would have listed them.

21 Q.          Okay.  As we sit here today, and based

22 on your review of those records, you don't

23 challenge the qualifications or expertise of those

24 caregivers or persons in those reports to render

1    the conclusions that they did?

2    A.          I can't think of any issue -- as we sit

3    here at this point, I can't think of any issue I

4    take with them.  I mean, you know, I may discuss

5    some of their findings critically.  I may, you

6    know, if they talk about neuropsychological

7    assessment, I may have some other conclusions or

8    some issues with some of the numbers, but nothing

9    sticks out in my mind.

10   Q.          Isn't it fair to say though that in the

11   report that you do render you do not challenge the

12   qualifications or the expertise or the ability of

13   those caregivers to render the conclusions or draw

14   the conclusions?

15   A.          None of that language appears in my

16   report.

17   Q.          And then, Doctor, when we go to --

18   after you go through the history, which was taken

19   from Joseph Hines as you said, then you have some

20   personal history, prior employment history, past

21   medical history, which was taken from him and

22   probably from the parents and perhaps from the

23   medical records, correct?

24   A.          Well, no.  In this section this history

13

1    comes from the patient.  If there is anything that

2    the parents endorsed or that the parents

3    described, I would specify the source of the

4    parents, and then what came from the documentation

5    is under the section review of documentation.

6    Q.          Okay.  And then the next part is where

7    you describe your mental status examination; is

8    that correct?

9    A.          That's right.

10   Q.          After that you do render your

11   diagnostic impression?

12   A.          That's right.

13   Q.          And that is based on the Diagnostic

14   Statistical Manual, correct?

15   A.          It follows the format suggested in that

16   document.

17   Q.          I'm just trying to, at the end, the

18   last page -- well, page 7 and finishing on page 8

19   you term it as "discussion."

20   A.          That's right.

21   Q.          Are these the opinions that you have

22   rendered in this case?

23   A.          Well, that is what we call a

24   formulation, and they are a representation of my

14

1    opinions.  I can talk about this matter at greater

2    length, and I assume that is why you came here,

3    than to just rely on these four paragraphs.

4    Q.          Right.  What I'm saying is, just to

5    make sure, in addition to your diagnostic

6    impression, the discussion encompasses all the

7    opinions you have rendered in this case?

8    A.          Well, when you stay all of the

9    opinions, if they were all of the opinions, I'm

10   not sure why you would be coming up here to talk

11   to me about it.  There may be other opinions I may

12   have, or I may be able to elaborate on these

13   opinions.  I tried to give a representation of

14   what I heard, what I saw, integrating it with what

15   I read and then combining that with what I know

16   about these conditions and these kind of cases, a

17   diagnostic impression and what I thought had

18   happened to him and what I thought his needs were.

19   Q.          Okay.  I just want to make sure that

20   there aren't other opinions out there that you

21   have rendered in addition to those included in

22   your report at pages 7 and 8.

23   A.          I tried to be thorough in my report,

24   but if you ask me to discuss these matters, I can

15

1    certainly elaborate.  I can't tell you what

2    Mr. Fieger or Miss Glazer or Mr. Harrington might

3    ask me at trial.

4    Q.          I'm not asking that.  I'm just trying

5    to clarify.

6    A.          I --

7    Q.          Let me finish my question.  All I'm

8    trying to do clarify is you are not aware of any

9    other opinions that you have in regard to this

10   case other than those included in your report?

11   A.          Well, I don't know if I can say that

12   because you are coming here to discuss these

13   things.  You are going to ask me questions.  I

14   mean if you want, I can -- whenever you ask me a

15   question, I can refer you to these four

16   paragraphs, but that is not why you are here.  You

17   are here for me to discuss these things.  I may

18   elaborate or describe them in some more detail, or

19   something that I say may flow out of these

20   opinions, but it may not be stated.

21              Since you are such a stickler for why I

22   didn't say Miss Glazer's secretary called and made

23   the appointment instead of that this man consulted

24   me, I want to be very careful in how I answer

16

1    these questions.

2    Q.          Well, Doctor, that's not really what I

3    asked you.  I'm just trying to find out --

4    A.          Well, no.

5    Q.          I am not trying to make it difficult.

6    I am just trying to find out -- I need to know

7    when I leave here today have you rendered any

8    other opinions as it relates to Joseph Hines for

9    purposes of this litigation other than what you

10   have included in your report.  That is all I'm

11   asking.

12   A.          I can't say that then for the reasons I

13   have said about three times.  But maybe it would

14   best serve you, and I'm not really here to advise

15   you, maybe it would best serve you to ask all the

16   questions that you have and then ask that as your

17   last question.

18   Q.          Okay.  You can't say whether or not you

19   have any additional opinions other than what is

20   included in your report?

21   A.          Because I don't know what you are going

22   to ask me.

23   Q.          Okay.  Now, Doctor, I want to clarify.

24   You indicated in your diagnostic impression that

1  it's your conclusion that Joseph Hines has

2  posttraumatic stress disorder; is that correct?

3  A.          That's right.

4  Q.          You have a cognitive and mood disorder

5  secondary to traumatic brain injury, frontal lobe

6  type, correct?

7  A.          That's right.

8  Q.          Is are those your diagnoses as to him?

9  A.          Yes.

10  Q.          Okay.  I want to then start with that.

11  You talk about -- we are going to talk about PTSD.

12  We are going to talk about the cognitive function

13  as well.  I just want to ask you about the

14  secondary to traumatic brain injury.  Upon what do

15  you base your opinion that he has suffered brain

16  injury?

17  A.          Well, the history that I have.  This is

18  a young man that was functioning without

19  difficulty, seemed to do well in high school, was

20  able to function in college, had an encounter that

21  he described with a group of police officers, and

22  he described being taken to the ground.  He

23  described regaining consciousness with handcuffs

24  and with his eyes swollen shut.

18

1          So I had a history of some head trauma,

2     facial trauma, and I think that that is consistent

3     with the records that I reviewed.  He had stitches

4     to his right temple and around his orbit.  He was

5     described in the records as demonstrating --

6     manifesting a peribulbar hemorrhage on the left

7     eye.  There was a history of a loss of

8     consciousness.

9     Q.          What do you base the history of loss of

10    consciousness from?

11    A.          That was from the Grant Medical Center.

12    Q.          Do you have any knowledge of whether or

13    not he did or did not lose consciousness?

14    A.          I wasn't there, and I didn't see it.  I

15    have that history.  I have a history -- let me

16    finish.  I have history of an impaired

17    recollection where he said, "That was the last

18    thing I remember, and then I woke up with all

19    these bruises around my face."

20          I have objective evidence of bruising

21    because that is quite specifically described.

22    Then I have a history of loss of consciousness.

23    So that is all consistent.  But was I an

24    eyewitness to that?  No.

1    Q.         And --

2    A.         Do you want me to finish answering your

3    other question, or are we moving on?

4    Q.         Sure.  Go ahead.

5    A.         So I have all that history and all

6    those description of findings.  Then I have a

7    history of poor memory, poor concentration, dismal

8    school performance and a deterioration from his

9    prior performance, a change in his demeanor with

10   irritability that is out of character for him, and

11   then I have a neuropsychological assessment from

12   the University of Michigan that describes areas of

13   impaired function.

14   Q.         Let me ask you about the physical

15   injury.  Are you aware of any test or any physical

16   indication of injury?  You said that you have

17   received reports from Joseph Hines.  You have

18   looked at the medical records, which are part of

19   everything.  Did you see any testing or any

20   physical indication that he had suffered brain

21   injury as you term it?

22   A.         So your question is did I see any

23   physical evidence that he suffered brain injury?

24   Q.         Yes.

1    A.          That is your question, because I want

2    to get to the question, not the preamble and not

3    the other part that you said.  Just so I'm sure I

4    understand your question, so your question is did

5    I see any physical evidence.

6              What I would say is the description

7    from the hospital of peribulbar bruising, impact

8    that would break -- impact to the face that would

9    break the skin, the peribulbar hemorrhage, that

10   would be presumptive evidence of brain damage, and

11   that impact capable of causing that kind of soft

12   tissue damage would cause damage to the underlying

13   brain tissue.

14   Q.          Okay.  In addition to the presumptive

15   evidence of brain damage, are there any other

16   tests or physical tests that were done that you

17   have reviewed in the record that would indicate

18   brain injury upon which you base your opinion on?

19   A.          Your question is besides what I just

20   said are there any other tests.  When you use the

21   term "physical tests," I'm not sure I understand

22   what you mean.

23   Q.          Any tests that you could see or observe

24   something that would indicate that.

```
 1   A.          What is a physical test?

 2               MS. GLAZER:  Are you asking him for

 3   objective evidence?

 4               MR. MANGAN:  I will ask.

 5   BY MR. MANGAN:

 6   Q.          Well, I want you to tell me everything

 7   upon which you base your conclusion there was

 8   brain injury, and you have already done some, and

 9   that is on the record.

10   A.          I tried to be thorough in my report.

11   So let me just say what I saw, what I heard, what

12   I read --

13   Q.          Okay.

14   A.          -- and what I know about how brain

15   damage occurs.

16   Q.          Okay.  Now, you know an MRI was done in

17   October of 2012?

18   A.          I do.

19   Q.          What did that show?

20   A.          Let's see.

21   Q.          In your report you did list it here.

22   You can look at your report.

23   A.          Thank you for that.  Yes.  The MRI was

24   read within normal limits.
```

22

1  Q.            Okay.   Then in your report you do

2  indicate that the MRI done October 27th, 2012 you

3  indicate in the second -- well, the first full

4  paragraph, "The MRI of the brain" -- let me read

5  it again.   "MRI of the brain for reasons of trauma

6  and memory lapse shows no acute intracranial

7  abnormality," correct?

8  A.            That is what it says, yes.

9  Q.            So the MRI was not indicative of a

10 brain injury?

11 A.            No, that is not true.   The MRI is a

12 very sophisticated, high resolution picture of the

13 brain that is expressed in pixels or little dots

14 of black and white.   The MRI is used to show

15 space-occupying lesions, blood clots, bleeding and

16 brain tumors that would be visible to the naked

17 eye.   It's expressed in pixels as I said before.

18 Each pixel would represent about 2,500 brain

19 cells.   The effective brain damage in

20 acceleration/deceleration injuries such as

21 sustained by Joseph Samuel Hines would not be

22 apparent on an MRI.

23            Furthermore, the MRI specifies there is

24 only no acute problems.   So this would be

23

1    something that might have been more prudently

2    undertaken in the first 24 to 36 hours after this

3    incident rather than weeks later.

4    Q.        But it did show no acute intracranial

5    abnormality, correct?

6    A.        I already answered that.

7    Q.        Isn't that correct?

8    A.        I want to be careful in answering that

9    because I don't want to give an answer that is

10   misleading that leads itself to be distorted

11   because although I agreed to that every time you

12   asked me about what it said, then you said well,

13   it shows no signs of brain damage.  That was

14   incorrect.  I want to be careful in saying that --

15   what it says is what it says.  There were no acute

16   signs of trauma.  The extent that the MRI could

17   visualize anything that would be visible to the

18   naked eye.

19   Q.        And there was no MRI done previously or

20   since then?

21   A.        To my knowledge.

22   Q.        That you are aware of?

23   A.        To my knowledge.

24   Q.        Okay.  And then a CT scan was done on

24

1   August 30th, 2012.  You are familiar with that,

2   aren't you?

3   A.        I am.

4   Q.        What did that show?

5   A.        I'm sorry.  I will have to review that

6   document.  All right.  "CT demonstration indicated

7   extensive facial swelling, left-sided contusions,

8   no subcutaneous gas, soft tissue induration and a

9   retrobulbar lesion on the left with no focal mass.

10  The conclusion was extensive facial contusions

11  more prominent on the left, left peribulbar

12  hemorrhage with slight proptosis through the left

13  globe, lens intact.  Right globe lens intraorbital

14  contents are normal.  There is fluid in the left

15  paranasal sinus.  Orbital bones are not fractured.

16  The brain imaging showed no acute intracranial

17  hemorrhage.

18  Q.        Okay.  So at least that did not

19  indicate a traumatic brain injury, did it?

20  A.        Well, when you say "at least," I'm not

21  sure what you mean.

22  Q.        Well -- let me rephrase.

23  A.        No.  No.  Well, all right.  Then ask

24  another question.

25

1   Q.        Okay.  That report did not indicate

2   traumatic brain injury, did it?

3   A.        No, that is not true.  That report just

4   indicated no intracranial bleeding.  That did show

5   extensive trauma to the head and face with

6   bleeding behind the eye, which is quite severe,

7   and which indicates trauma of the force that is

8   quite typical in causing brain damage to the

9   underlying tissue.

10         The computerized tomogram is a much

11   lower resolution imaging tool for the cranial

12   contents, so if the MRI wouldn't show that kind of

13   damage, the CT would be even less likely to do so.

14   Q.        But my question is more simple than

15   that, Doctor.  The CT scan, while you think there

16   might be better ways to observe brain damage, I

17   think you have made that clear, or brain injury,

18   this CT scan that was done did not indicate brain

19   injury, did it?

20   A.        Well, again, I think answering it any

21   other way than the answer I gave you would lend

22   itself to distortion or misunderstanding.  I'm not

23   going to agree with the statement that you made

24   because I don't think it is correct.  That would

1    be like saying an x-ray of his foot didn't show

2    brain damage, although that would be absolutely

3    true, that would be fallacious.

4    Q.        Okay.  But this would be absolutely

5    true, that the CT scan did not show or indicate

6    brain injury?

7    A.        No, that would be fallacious to say

8    that it did not indicate brain injury.  It just

9    showed that there was no bleeding on the brain

10   that was visible to the naked eye.

11   Q.        You have mentioned some other tests.

12   We're not going to go through all those.  Are you

13   familiar with any testing, as you have indicated

14   when you talked about different ways of doing the

15   MRI or the CT scan, are you aware of any tests

16   that were done, and that is the type of term I'm

17   using, that indicated that there was brain injury

18   suffered by Joseph Hines?

19   A.        Neuropsychological test demonstrates

20   the effects of brain injury, and the imaging

21   studies as well as the descriptions of this young

22   man's face demonstrate soft tissue injuries that

23   are consistent with the kind of forces that cause

24   brain damage.

```
 1   Q.          Okay.  So you saw soft tissue injury

 2   that could be consistent with what would lead to a

 3   brain injury, correct?

 4   A.          I like the way that I said it better.

 5   That is sort of what I said.  If you need to

 6   paraphrase it, you may, but that is not exactly

 7   the way I said it.

 8   Q.          The record will reflect what you just

 9   said.

10   A.          It will.

11   Q.          You say what you saw were the effects.

12   In addition to the way you phrased the soft tissue

13   and the effects that you saw through the

14   neuropsychological, did you see any other type of

15   testing when you reviewed the records that would

16   indicate traumatic brain injury?

17   A.          Any other testing besides the extensive

18   soft tissue damage, the poor performance under a

19   psychological assessment, the historical

20   descriptions.  Not that I can think of.

21   Q.          Okay.  Now, Doctor, is there -- in

22   addition to what you have already said is there

23   anything else that you either observed or relied

24   upon that would indicate a traumatic brain injury?
```

1  A.          Well, the history that I obtained and

2  the way this man responded and reacted in his

3  interview with me was consistent with the other

4  histories and consistent with the other findings.

5  Q.          Anything else?

6  A.          His parents' description of the

7  personality changes that occurred were consistent

8  with what I observed and were consistent with what

9  was described in the records.

10  Q.          Anything else?

11  A.          Not that I can think of at this time.

12  There is a lot of stuff that I evaluate and a lot

13  of things that I said in my report.  I tried to be

14  thorough in my report.

15  Q.          Doctor, I want to make sure I

16  understand.  It's your opinion that he suffered

17  traumatic brain injury for the reasons you have

18  stated and those reasons included in your report,

19  correct?

20  A.          And other things that I have been

21  talking about for the last 20, 30 minutes.

22  Q.          That is what I said, from what you

23  already said here today.  Now, when you say

24  "traumatic brain injury," are you equating that

29

1    with brain damage, because you use the term "brain

2    damage" in your report as well.

3    A.          Yes.  Yes.

4    Q.          So you are saying --

5    A.          Brain injury causes brain damage.

6    Q.          Okay.  It can, right?

7    A.          I'm trying to think of a brain injury

8    that wouldn't cause brain damage.  I suppose I

9    could concoct some far-fetched scenario.

10   Q.          You would also have to consider the

11   severity of the damage that was caused by the

12   injury?

13   A.          Well, the severity, extent of the

14   damage, the location of the accompanying comorbid

15   psychiatric illnesses, other host factors that

16   might speak to the degree of morbidity for a given

17   damage.

18   Q.          Okay.  And when you say "brain damage,"

19   is that a medical diagnosis?  Are you rendering

20   brain damage as a medical diagnosis?

21   A.          I don't think brain damage is a medical

22   diagnosis.  I think the medical diagnosis is

23   cognitive and mood disorder secondary to traumatic

24   brain injury.

1    Q.          Okay.

2    A.          But brain damage is just a description.

3    You can say tissue damage.  That is not a

4    diagnosis.  Tissue damage can occur from burns,

5    chemicals, trauma, metabolic disease.

6    Q.          I want to make sure I understand.  Your

7    diagnosis is cognitive impairment as a result of

8    brain damage; is that fair?

9    A.          You seem to need to rephrase.

10   Q.          I'm not trying to rephrase.  I'm trying

11   to understand.

12   A.          Let me finish.  If you're trying to

13   understand, why don't you listen to me then?

14   Q.          I am listening.

15   A.          When you interrupt me, then that --

16   Q.          Well, you have interrupted me too, so I

17   will stop interrupting you.

18   A.          Then I apologize.

19   Q.          I'm sorry too.

20   A.          I'm sorry.  You win.  I will wait until

21   you are done speaking, and then you can give me

22   permission to speak.

23   Q.          Well, I don't think we need to do that.

24   A.          Okay.  All right.  My diagnoses are as

1   stated in the section diagnostic impression, and

2   what I said was cognitive and mood disorder

3   secondary to traumatic brain injury.

4            I take issue because you paraphrased,

5   and you said well, cognitive impairment.  I didn't

6   use that language.  When you say you are trying to

7   understand, I just want to stick to the language

8   I'm using.  If you want to know what a word means,

9   I will explain it to you.

10           Cognitive and mood disorder secondary

11  to traumatic brain injury frontal lobe type means

12  that he sustained an injury to his brain that

13  caused damage to the underlying tissue and

14  impairment in the function of that tissue because

15  of that damage that affects both cognition, that

16  is the ability to think clearly and remember, and

17  mood, that is the ability to regulate his feelings

18  and for his feelings to respond to the external

19  environment without being affected by damage to

20  the mechanism that regulates moods.

21  Q.           Now, Doctor, if he suffered a traumatic

22  brain injury on August 29th, 2012, would you

23  expect to see contemporaneous problems with

24  cognition as you have defined?

32

1    A.           You may, or there may be a delay to the

2    onset of problems with cognition, depending upon

3    the nature and location of the brain injury.

4    Sometimes these disorders take several days or

5    even several weeks to evolve and to manifest

6    themselves completely.

7              Sometimes in a case like this where

8    there are soft tissue injuries, there is pain and

9    stitches.  The effects of those injuries and

10   medications used to treat those injuries can often

11   mask or impair the manifestation of underlying

12   brain damage, so the condition may not manifest

13   until some time later.

14   Q.           You don't address that in your report,

15   do you?

16   A.           I wasn't asked anything about that.

17   That is one of those things that when you asked if

18   these were all my opinions, I said I tried to be

19   complete, but I didn't know what you were going to

20   ask.

21   Q.           Yes.  Okay.  Again, I'm just -- my

22   question is you didn't indicate that in your

23   report for whatever reason, you weren't asked or

24   whatever, but it's not included in your report?

1   A.          No.  I didn't address that specific

2   issue in my report because I understood that I had

3   an opportunity to discuss these matters in a

4   couple of different forums.

5   Q.          If somebody suffered traumatic brain

6   injury on August 29th, 2012, would you expect to

7   see a decrease in academic performance

8   contemporaneously?

9   A.          If somebody -- are we talking about --

10  this is a hypothetical question?

11  Q.          Yes.  Let's do a hypothetical.

12  A.          You may or may not.  It depends on how

13  challenging the academic test was, whether it was

14  ever learned or not, whether the instructors were

15  understanding or more demanding and whether there

16  were other supports.  Academic performance is not

17  solely affected by cognitive function.

18  Q.          What about academic performance in

19  college?  Let's use college as an example.

20  A.          It's not solely affected by cognitive

21  disorders.  There are a number of factors that go

22  into it.

23  Q.          But would you expect to see some

24  decrease in academic performance as a result of a

34

1    traumatic brain injury?

2    A.          Excuse me.  Could you read back my

3    answer to that question the first time it was

4    asked?

5              (The requested portion of the record

6    was read by the reporter at 5:53 p.m.)

7              "A.  You may, or there may be a delay

8    to the onset of problems with cognition, depending

9    upon the nature and location of the brain injury.

10   Sometimes these disorders take several days or

11   even several weeks to evolve and to manifest

12   themselves completely.  Sometimes in a case like

13   this where there are soft tissue injuries, there

14   is pain and stitches.  The effects of those

15   injuries and medications used to treat those

16   injuries can often mask or impair the

17              manifestation of underlying brain

18   damage, so the condition may not manifest until

19   some time later."

20   A.          That is my answer.  That is the first

21   time you asked it, and it's still the answer.

22   BY MR. MANGAN:

23   Q.          Let me ask you.  In your report at page

24   7 your opinion -- let me just start the third

1    paragraph.  I believe it's the third sentence.

2    You stated, "His illness is complicated by the

3    fact that he sustained brain damage in the

4    assault, and his neurological assessment

5    demonstrates impairments that are not consistent

6    with his prior educational achievements."  You

7    stated that, right?

8                 MS. GLAZER:  Objection.  You didn't

9    read it correctly.

10   A.          You didn't read it correctly.

11   BY MR. MANGAN:

12   Q.          Why don't you read it then?

13   A.          That sentence?

14   Q.          Yes, please.

15   A.          "His illness is complicated by fact

16   that he sustained brain damage in the assault, and

17   his neuropsychological assessment demonstrates

18   impairments that are not consistent with his prior

19   educational achievements."

20   Q.          Now, you wrote that?

21   A.          Well, I dictated it.

22   Q.          Okay.  You read it accurately, right?

23   A.          Yes, I did.

24   Q.          Okay.  Explain to me what you mean by,

1   "Not consistent with his prior educational

2   achievements."  What do you mean by that?

3   A.          Well, he gave me a history, and I

4   believe it was endorsed by his parents, that he

5   graduated high school with a 3.87 grade point

6   average.  Then he told me he has a 2.0 or 2.1

7   grade point average.  He said he did poorly as a

8   freshman, was on probation and improved his

9   performance in his sophomore year racing his

10  grades to a 2.3 or 2.4.  But after the assault he

11  had problems concentrating, problems remembering.

12          Again, academic performance is affected

13  by more than simply cognitive abilities.  It's not

14  unusual for a kid who does well in high school to

15  go away to college and go to a more stimulating

16  environment and not perform as well.

17          But certainly the kind of struggling

18  and the kind of performance that is described on

19  this neuropsychological assessment is not

20  consistent with someone who would get over a 3.5

21  in high school.

22  Q.          Did you review his academic record,

23  whether it be high school and/or college?

24  A.          No, I didn't.

37

1   Q.        When you talk about his prior academic

2   achievements, is it fair to say that you relied

3   entirely on Joseph Hines telling you what his

4   academic achievements had been and his parents had

5   told you they had been?

6   A.        I'm sure the judge will decide what is

7   fair, but what I did was take a history, and I

8   relied on the history that was taken from the

9   patient and endorsed by his parents.

10  Q.        Okay.  That is the only thing you

11  relied upon to make the statement about his prior

12  academic achievements?

13  A.        Well, I didn't see his academic record.

14  Q.        Okay.  And I'm not trying to be

15  difficult.  You told me you got it from the

16  parents; you did not see his academic record.  Did

17  you see anything to indicate -- anything else?

18  I'm trying to clarify.

19  A.        I didn't see anything else that made

20  reference to his grade point average unless --

21  hold on for a second.

22  Q.        I'm not asking just about his grade

23  point average.  I'm asking about prior educational

24  achievements.

38

1  A.          No, I can't think of anything that

2  described prior academic achievements.

3  Q.          Okay.  And Doctor, in that same

4  sentence you indicate that, "His illness is

5  complicated by the fact that he sustained brain

6  damage."  Is it your belief that it is a fact that

7  he sustained brain damage, or is that your

8  opinion?

9  A.          Well, let me answer as best I can.

10  It's my conclusion within a reasonable degree of

11  medical certainty based on the things that we have

12  been discussing all evening that that is what

13  happened.

14          Whether it's a fact or not I believe is

15  up to the finder of fact in this matter, not to

16  anyone in this room.  But to advise the finder of

17  fact, I would tell the finder of fact in this

18  matter that that was my opinion within a

19  reasonable degree of medical certainty.

20  Q.          But you did call it a fact.  I didn't

21  make that up, did I?  That is your wording?

22  A.          I refer to it as a fact.  Whether it is

23  accepted as a fact in a proceeding such as this, I

24  was only advising his attorney of my medical

1  findings.  But in these proceedings whether or not

2  it is a fact or not is up to the judge or the

3  jury.

4  Q.          Okay.

5  A.          But again, that is my conclusion,

6  within a reasonable degree of medical certainty

7  that I'm comfortable calling it a fact as someone

8  who is not a lawyer.

9  Q.          And then Doctor, going again to the

10  same part of your opinion part of the discussion,

11  the same page, page 7, and I will read it.  If I

12  read it wrong let me know.

13  A.          Then I will have to read it.

14  Q.          "A careful review of his psychosocial

15  history reveals no other factors capable of

16  causing a pattern of decompensation of this type

17  other than a response to injuries sustained in the

18  assault."  Did I read that correctly?

19  A.          I think so, yes.

20  Q.          And you did state that?

21  A.          That is what my report says, yes.

22  Q.          Okay.  I just want to make sure I

23  understand some things.  When you say, "A pattern

24  of decompensation of this type," I'm just trying

40

1    to find out are you talking about cognitive

2    functioning?  Are you talking about PTSD?  Are you

3    talking about both?  Are you talking about other

4    things?  You talk about a pattern of

5    decompensation of this type.  Can you tell me what

6    you meant by that?

7    A.          Well, that is like three questions.

8    Q.          Well, okay.  Let me make it one

9    question.

10   A.          Yes.  It will make it easier for me.

11   Q.          Tell me what you meant when you stated

12   the term, "A pattern of decompensation of this

13   type."

14   A.          A pattern of decompensation of this

15   type means a summary of all the patients' signs

16   and symptoms and everything that is described in

17   the medical documentation that I have reviewed.

18   So looking at the history that he provided to me

19   of what happened to him, the history of how it

20   affected him, the endorsement that his parents

21   gave and the personality changes and emotional

22   changes and behavioral changes in him, the soft

23   tissue swelling and the bleeding behind his

24   eyeball and all of the signs of facial trauma and

41

1    everything else I include in my report, that is

2    what I mean by a pattern of decompensation.

3              It's all the symptoms, all the

4    complaints, all the findings and all the

5    descriptions in the other medical reports,

6    including the neuropsychological assessment, the

7    collateral history from the mother, the way they

8    described how he looked in the hospital the day

9    after the assault.

10   Q.        Taking that answer into consideration,

11   it's your opinion that no -- absolutely no other

12   factors are capable of causing that pattern of

13   decompensation?

14   A.        I don't recall using the term

15   "absolutely" in my report.  If you had a need to

16   put that in there --

17   Q.        I didn't say "absolutely," Doctor.  Let

18   me read it to you.

19   A.        I didn't say "absolutely."  Did he say

20   "absolutely"?  Maybe you can read his question for

21   the record just so we can both be clear.

22   Q.        No.  You don't need to read the

23   question back.  I want to ask you.  You stated, "A

24   careful review of the psychosocial history reveals

1    no other factors capable of causing a pattern of

2    decompensation."  Is that your accurate opinion?

3    A.          That is my opinion within a reasonable

4    degree of medical certainty.

5    Q.          I just want to clarify.  No other

6    factors can cause the pattern of decompensation

7    that you believe occurred?

8    A.          No other factors that I was able to

9    find in his history.  When you say no other

10   factors, I mean if he was in a car accident, he

11   could have had similar problems, or if he was

12   injured under some other circumstances, but we

13   have no history that he was.  If he was born with

14   certain congenital problems, well, that really

15   wouldn't present this pattern, but if he had some

16   congenital problems that were causing the

17   impairments that I noted and the kinds of things

18   that were described in the neuropsychological

19   assessment, they would have manifested themselves

20   in other settings, and they haven't.

21   Q.          So just to make it very clear, and you

22   have already said you are limiting it to what you

23   know and what you have included in your report,

24   and you are aware of no other factors capable of

1  causing a pattern of decompensation of this type?

2       MS. GLAZER:  Asked and answered.

3       MR. MANGAN:  I don't think it was.

4  A.       Well, with the way you asked it, the

5  only thing I can tell you is that after taking

6  what I considered to be a thorough and detailed

7  history, after taking collateral history from his

8  mother and from his father, after reviewing the

9  medical documentation I have been provided, and

10 including the items in 1 through 5, there were no

11 other historical factors that would explain this

12 pattern of decompensation other than a reaction to

13 brain damage sustained in that assault.

14       Specifically the fact that the soft

15 tissue injuries represent the effects of forces

16 that are capable of causing brain damage in the

17 areas that typically cause reactions to brain

18 damage of this type, and assaults of this type

19 such as he described are the kind of assaults that

20 are associated with posttraumatic stress disorder.

21 BY MR. MANGAN:

22 Q.       When you say, "such as he described,"

23 what do you mean by that?

24 A.       Well, from the history that he gave.

1    Q.          Do you recall the history that he gave

2    of the actual incident?

3    A.          Yes, on page 1 and page 2 of my report.

4    Q.          And using that report do you remember

5    what he said actually happened to him?

6    A.          Do you want me to read from my report

7    again?

8    Q.          You don't have to read the whole

9    report.

10   A.          What sentences do you want me to read?

11   Q.          Why don't you take a look?  Do you

12   remember exactly what he told you about the

13   alleged assault?

14   A.          Well, I don't know that this was a

15   verbatim transcription of what he told me, but I

16   tried to be as close to verbatim as possible.  But

17   what he said was that he and his friends were

18   speaking when to officers, a male and female, rode

19   by on bicycles.  The officers passed them, turned

20   around --

21   Q.          Okay.

22   A.          Is that not what you want me to do?

23   Q.          I don't want you to read the whole

24   thing.  I'm asking about the alleged assault.

45

 1   Let's limit it to that.

 2   A.         Tell me what sentence to start reading,

 3   and tell me where to stop.

 4   Q.         If you want to look at it, it says

 5   that, "He," meaning Joseph, "states the officers

 6   then grabbed his wrist to restrain him and

 7   handcuffed him."  I'm sorry.  It's on page --

 8             MS. GLAZER:  Do you want him to read

 9   it, or are you going to read it?

10   A.         Do you want me to read it, or do you

11   want me to read it?  It's already an exhibit, so I

12   assume it's in evidence.

13   BY MR. MANGAN:

14   Q.         I'm limiting it to the actual assault

15   which you have used a lot, the term "assault."

16   The second full paragraph that Joseph Hines told

17   you that he was tackled by both of the officers,

18   he was taken to the ground and handcuffed.  He

19   states that was the last thing he remembered.

20   A.         Until he woke up with his eye swollen

21   shut, bruises on his face and his face was

22   burning, which he inferred because they attempted

23   to subdue him with mace or some sort of pepper

24   spray.

```
 1    Q.         Do you use the term, "When he woke up"?

 2    A.         No, I don't.

 3    Q.         I don't see that in there.

 4    A.         That was his next recollection.

 5    Q.         The next thing he remembers?

 6    A.         When I say something, you seem to have

 7    to have a need to put it in your own words.

 8    Q.         No.  I have a right to ask.

 9    A.         Sure.  But that isn't what I said.  If

10    you are asking me what I said, what I said was

11    that was his next recollection.  If we are going

12    to be that picky about what word I put in my

13    report, then I'm going to be very precise in using

14    the words I use.

15    Q.         We are going to be picky, Doctor,

16    because you gave a report, and I have every right

17    to ask you questions.

18    A.         I'm not disputing your right.

19    Q.         When you use a word like "awoke" and I

20    ask you that isn't in your report, that is all I'm

21    trying to find out.  If that is being picky, I'm

22    sorry.

23               MS. GLAZER:  Do you want him to read

24    the exact term in his report?
```

47

```
 1   A.          If you want me to read the report, tell
 2   me to read the report.
 3   BY MR. MANGAN:
 4   Q.          No.  That's not the way we are doing
 5   it.
 6   A.          I'm trying to figure how we are doing
 7   it so I know what you want to know.
 8   Q.          Well, I don't know why you are trying
 9   to be so difficult, but that's fine.
10   A.          I beg your pardon.  I beg your pardon.
11   Q.          I think you are being very difficult.
12   A.          Well, you know, when in a conversation
13   with someone difficult, it's very, very important
14   to make sure that the difficult person isn't
15   likewise engaged.  I'm really trying to cooperate
16   and answer your questions, but I have to be
17   precise.  You have a job to do.  I have a job to
18   do.  I have to be precise in expressing myself.
19          I don't want anything I say to be
20   easily distorted or misinterpreted, taken out of
21   context or used in a manner in which I didn't
22   intend it to be used, so I'm trying my best to be
23   precise.  I don't mean to be difficult, but when I
24   say something and then you give a very long speech
```

48

1  and you paraphrase what I say, I can only say that

2  that is not what I said and that is not the way I

3  said it.

4  Q.         Well, we disagree on that, Doctor.

5             MS. GLAZER:  You started out asking him

6  to read the report, and then you started reading

7  it.  I'm still trying to get what your question

8  is.

9             MR. MANGAN:  I think I'm trying to make

10 a question.

11            MS. GLAZER:  Let's start over and make

12 a question.

13 BY MR. MANGAN:

14 Q.         You used the words, "when he awoke."

15 The report does not include the words, "when he

16 awoke."

17 A.         I already answered that.

18 Q.         No, you didn't.

19 A.         We can go back to the record, but I

20 did.  I said that I did not use the word "awoke"

21 in my report.  I used the term "his next

22 recollection."

23 Q.         Okay.  Now, Doctor, is there any other

24 -- in addition to what you have included in your

49

1    report and what you have already said, are there

2    any other opinions you rendered with relation to

3    your opinion that he suffered brain injury

4    resulting in cognitive dysfunction, however you

5    termed it in your report?  I'm not trying to use a

6    different word.

7    A.          I've tried to be as thorough as I can,

8    and I have tried to answer every question you

9    asked me.

10   Q.          Okay.  I want to ask you about the

11   neurological assessment or the neuropsychological

12   assessment, okay?

13   A.          Ask away.

14   Q.          I'm looking at page 5 of your report.

15   A.          Page 5 of my report.

16   Q.          Yes.  The second full paragraph.  You

17   say -- let me just go through it.  I will try not

18   to go too fast.  "University of Michigan performed

19   a neuropsychological assessment.  The patient's

20   history is consistent with that provided to me.

21   The patient passed the TOMM, which would indicate

22   that he was making good effort.  Full scale IQ was

23   109 with a verbal IQ of 116 and a performance IQ

24   of 102.  The patient's skills within executive

50

1    functioning domains were variable.  Working memory

2    was in the high average range.  Mental arithmetic

3    was average.  Auditory and Visual Continuous

4    Performance Test was average to high average.

5    Performance was impaired on measures of vigilance,

6    sustained attention.  On a task of cognitive

7    flexibility and resistance to interference his

8    performance was in the low average range."  Did I

9    read that accurately?

10   A.        Yes.

11   Q.        You included that in your report,

12   correct?

13   A.        I did.

14   Q.        Now, is that indicative in your opinion

15   of cognitive impairment or cognitive functioning

16   problems?

17   A.        It's indicative of impairment in

18   frontal lobe functioning, and the pattern of

19   strengths in certain domains and weaknesses in

20   others is consistent with an acquired deficit

21   rather than something that is congenital or

22   inborn.

23             If it's congenital or inborn, then all

24   the domains should vary within concert, but

1    because of this variability and because of the

2    impairments in the areas of executive functioning

3    and the history of all the trauma around his eyes,

4    especially his left eye, those are consistent

5    findings.  Those are domains that are served by

6    the brain areas that are retroorbital or behind

7    the eyes.

8    Q.        Now, are you aware, based on your

9    review of the records, of any baseline upon which

10   you could compare this neuropsychological

11   assessment with anything else?

12   A.        What I understand is that there is no

13   evidence anywhere that there was any premorbid

14   neurocognitive dysfunction.

15   Q.        Well, let me be a little more specific.

16   Maybe it's too general.  The IQ score that is

17   indicated in here, are you familiar with any other

18   IQ testing that you looked at or saw that would

19   indicate that that is different than what it was

20   prior to the incident of August 29th, 2012?

21   A.        So the question is am I aware of any IQ

22   score that was generated before the assault or

23   have I seen any IQ score and compared it to the

24   University of Michigan findings.  No, I haven't

52

```
 1   seen his educational records, but I want to be
 2   careful in answering that question because I don't
 3   want to endorse the fact that an IQ test can be
 4   reasonably compared to a neuropsychological
 5   assessment.
 6           An IQ test doesn't test exactly the
 7   same things that a neuropsychological test would
 8   evaluate.  So at the risk of that being an
 9   invidious comparison, I don't know of any IQ
10   testing that exists.
11   Q.         For any of the other items, for lack of
12   a better term, listed in that paragraph, are you
13   aware of any prior testing that would give you,
14   again, for lack of a better term, a baseline to
15   determine if there is a difference pre August
16   29th, 2012 and post August 29th, 2012?
17   A.         As far as I could determine, there is
18   no evidence that any of those determinations were
19   undertaken prior to the assault.  Again, I want to
20   be careful in answering that because I want to
21   make sure that at some later point I'm not asked
22   to compare an educational battery or tests that
23   were given for other purposes or academic purposes
24   to a neuropsychological assessment because that
```

53

1   would be an invidious comparison.

2   Q.          But you didn't see any of those?

3   A.          There is no history of any description

4   of any cognitive impairment prior to the assault.

5   Q.          That wasn't my question.  My question

6   was you didn't see any other, I think you used the

7   term educational -- I'm sorry.

8           MR. MANGAN:  Could you read that one

9   back, his answer to that?

10          (The requested portion of the record

11  was read by the reporter at 6:16 p.m.)

12          "A.  As far as I could determine, there

13  is no evidence that any of those determinations

14  were undertaken prior to the assault.  Again, I

15  want to be careful in answering that because I

16  want to make sure that at some later point I'm not

17  asked to compare an educational battery or tests

18  that were given for other purposes or academic

19  purposes to a neuropsychological assessment

20  because that would be an invidious comparison."

21  BY MR. MANGAN:

22  Q.          So my question is, trying to use your

23  terms, you are not -- you did not see or are you

24  aware of any other educational battery or test

54

1   when you were doing your report?

2   A.          And I think three times in response to

3   your questions I said that I haven't seen his

4   school records, so I wouldn't be aware of any

5   educational testing.

6   Q.          There could be even beyond school

7   records.  I'm asking for any other tests.

8   A.          Like where?

9   Q.          I don't think you said it three times,

10  but that's fine.  Okay.

11              Now, let's go to posttraumatic stress

12  syndrome, okay or disorder, PTSD, posttraumatic

13  stress disorder, correct?

14  A.          Is that how we refer to the disorder?

15  To answer your question, yes, the proper

16  terminology is posttraumatic stress disorder.

17  Q.          You did determine that he is

18  experiencing posttraumatic stress disorder?

19  A.          He suffers from that condition.

20  Q.          Okay.  Do you conclude that based on

21  the symptoms that you have learned that he is

22  experiencing?

23  A.          I conclude it based on the history I

24  have obtained, collateral history from his

1    parents, observations that I made during my mental

2    status examination, my experience with diagnosing

3    those conditions and my review of the documents

4    that I have been provided.

5    Q.        Okay.

6              MS. GLAZER:  Tim, off the record.

7              (Recess taken at 6:18 p.m.)

8              (Back on the record at 6:21 p.m.)

9    BY MR. MANGAN:

10   Q.        Doctor, we were talking about PTSD.

11   A.        Yes.

12   Q.        We can use that term for posttraumatic

13   stress disorder, correct?

14   A.        Sure.

15   Q.        And you explained how you arrived at

16   that conclusion, I believe, and the record will

17   reflect that.  I wanted to ask you then, you

18   indicate in your report at -- let me see.  I have

19   it here.  Do you ever in your report -- or did you

20   render an opinion as to the severity of PTSD?  Is

21   that something doctors do or not?  That is two

22   questions.

23   A.        It is.

24   Q.        Let me back up.  Do doctors identify

56

1   severity of PTSD or not?

2   A.          A doctor may comment on severity.

3   Usually issues of severity are addressed in Axis

4   5, highest level of functioning in the prior year

5   where a global assessment of function score is

6   given.  In this case I gave a score of 50, which

7   is a significant impairment.  That impairment is a

8   combination of the effects of the cognitive and

9   mood disorder secondary to traumatic brain injury

10  and posttraumatic stress disorder.

11          Furthermore, the determinant of

12  morbidity in posttraumatic stress disorder has

13  something to do with its duration.  I saw him in

14  2014.  This incident occurred in 2012.  Generally

15  if PTSD lasts for longer -- symptoms last for

16  longer than six months the situation is said to

17  become chronic -- or the condition is said to

18  become chronic.  Literature supports the finding

19  that if symptoms are present at six months, they

20  are likely to be present at a year and five years.

21  Q.          In fact, in your report at page 7,

22  paragraph 3, you do say, "The fact that he

23  remained symptomatic some two years after this

24  incident -- or the incident portends a poor

1   prognosis."

2   A.      That's right.

3   Q.      You did have a poor prognosis for him?

4   A.      I do.

5   Q.      Did you consider any other of the

6   prognosticators for prognosis -- any other factors

7   in the DSM that talk about prognosticators?

8   A.      Any other factors that talk about

9   prognosticators. I don't know what you mean.

10   Q.      I don't either.

11   A.      We are in agreement here.

12   Q.      Perhaps we will withdraw it. You are

13   familiar in DSM-5 there is some discussion about

14   factors having to do with prognosis; is that

15   accurate?

16   A.      Yes, DSM-5 is still relatively new.

17   Although it has been adopted, it hasn't been

18   formally and ultimately adopted. We are in the

19   process of -- we are in the early stages of

20   evaluating it, but yes, it does speak of

21   prognostic indicators.

22   Q.      And you did use DSM-5?

23   A.      Well, no. This is more of the

24   convention that is suggested in DSM-4. As I said,

```
1    DSM-5 is still evolving.  I considered some of the

2    changes and alternatives that are suggested in

3    DSM-5.

4    Q.        You used the fifth axis in your

5    diagnosis?

6    A.        Yes.

7    Q.        Which is in DSM-5, but not DSM-4?

8    A.        No.  All of the Axes are in DSM-4 and

9    5.

10   Q.        There is a fifth?

11   A.        Yes.

12   Q.        There always was?

13   A.        Yes.  Not always.  Not in DSM-2.

14   Q.        Did you consider any other, besides the

15   duration which you have referenced --

16   A.        I --

17   Q.        Let me finish.  Besides the duration

18   did you consider any other prognosticators?  For

19   instance, that he didn't have problems before the

20   incident, for instance, that he has a family, that

21   he apparently has support, for instance, that he

22   is continuing to go to college, things like that.

23   Did you consider any other prognostic indicators?

24   That's a better term, I think.
```

1    A.          Well, I want to be careful in endorsing

2    that those are reliable prognostic indicators in

3    spite of what the DSM describes.  The DSM is only

4    a guideline.  But yes, I did take into the fact

5    that he had concerned parents.  I had a chance to

6    interview and meet the parents and take a

7    collateral history from them.  I did know he

8    manifested a very traditional work ethic and

9    traditional education ethic.

10          I think that he conveyed to me in

11    sentiment, and I think he articulated to the

12    University of Michigan people, that his -- part of

13    his reaction to this was to become earnest in his

14    schoolwork, earnest in his resolve to pursue his

15    education.

16          I also took into account that he is at

17    a very -- he is a member of a very vulnerable risk

18    group for developing post traumatic symptomatology

19    in that he is a young adult, that there is likely

20    to be greater morbidity in someone who has a

21    positive blood alcohol level at the time of being

22    traumatized both on the effects of brain damage

23    and the effects of trauma, also that there were

24    physical effects to this trauma and that the

60

 1    situation was humiliating and physically and

 2    emotionally painful to him.  But yes, I did

 3    consider other factors than just the duration of

 4    his symptomatology.

 5    Q.          Okay.  Are you familiar with the

 6    therapy or the treatment that he is receiving from

 7    Ohio State University?

 8    A.          Yes.

 9    Q.          Did you review those records?

10    A.          No, I don't believe I have seen those

11    records.

12    Q.          So you can't make a determination as to

13    whether or not he has been responsive to therapy

14    or nonresponsive to therapy?

15    A.          Oh, I can tell that his response to

16    therapy has been less than robust because of the

17    degree of symptomatology that he manifests two

18    years later in spite of having received treatment.

19    Q.          But you haven't reviewed the records

20    from the therapist to indicate whether or not they

21    have seen progress or a lack thereof?

22    A.          Well, I haven't seen the records, and I

23    already said that I haven't seen the records.

24    Q.          Right.

61

1   A.          I haven't seen the records to see if

2   that was addressed in the records either.

3   Q.          Okay.  Would that be significant to

4   you, to see how somebody is responding to therapy

5   when you are making a prognosis?

6   A.          Well, I want to be careful in answering

7   that because in looking at his condition and

8   listening to the presence of symptomatology, I

9   think I can evaluate his response to therapy.  I

10  think what you are asking me would be better

11  focused on what his therapist thought of his

12  progress.  And again, regardless of what his

13  therapist thinks of his progress, he remains

14  symptomatic, and he remains significantly troubled

15  with a significant impairment in his ability to

16  function attributed in part to the diagnosis of

17  posttraumatic stress disorder.  His symptoms are

18  still there.

19  Q.          So you don't know what his therapist

20  feels is his response to therapy?

21  A.          I don't know what they think or have

22  written.  I haven't talked to hem.

23  Q.          You don't know whether or not they were

24  observing cognitive impairment or not?  Do you

1  know that?

2  A.           Well, all I can say is I can't tell you

3  if they have seen that or addressed it because I

4  haven't seen those records, and if they are

5  providing him cognitive restructuring and every

6  action of the typical modalities of treatment for

7  posttraumatic stress disorder, they may not be

8  focusing on cognitive impairment, or they may not

9  have had the advantage of looking at the

10 University of Michigan neuropsychological

11 assessment records, or they may not have had the

12 benefit of seeing the extensive soft tissue damage

13 to his face and eyes that accompanied this

14 assault.  I can't say what their opinions would

15 be.

16 Q.           You can't say whether or not they at

17 OSU see the PTSD as more severe or less severe

18 than you see it?

19 A.           I haven't seen those records.

20 Q.           Okay.  Now, Doctor, I want to -- I hope

21 quickly, but we will see.

22 A.           I will do my part.

23 Q.           I just want to go through.

24 A.           I'm talking fast.

63

```
 1   Q.          Again, going back to your report, you

 2   have been through what you did for the report.  I

 3   think it is clear in your report, but you did an

 4   exam of Joseph Hines, correct?  That was number

 5   one -- or not number one, but that was one of the

 6   things you did as part of your evaluation in order

 7   to produce the report.

 8   A.          I did a psychiatric evaluation.

 9   Q.          Okay.  How long were you with Joseph

10   Hines to do the psychiatric evaluation?

11   A.          A couple of hours.

12   Q.          A couple of hours.  And you saw him

13   alone?

14   A.          I did.

15   Q.          And you think it was two hours, three

16   hours?

17   A.          I said a couple of hours.  It was about

18   two hours, maybe an hour and 45 minutes, maybe as

19   much as two hours and 15 minutes.  I didn't time

20   it.

21   Q.          Okay.  And you conducted a mental

22   status examination?

23   A.          I did.

24   Q.          That consists of what you have included
```

1    in your report there at pages 5 and 6, correct?

2    A.        That is recorded in my letter to Miss

3    Glazer.

4    Q.        Which is what I'm calling a report?

5    A.        That's right.

6    Q.        You are not calling it a report?

7    A.        A report.

8    Q.        I'm just asking.  I didn't know if

9    there was another report or if I was calling it

10   wrong.

11   A.        No.

12   Q.        Then during that time you took a

13   history from him?

14   A.        I did.

15   Q.        That is pretty well documented in there

16   as well.  Did you assess the credibility of

17   Mr. Hines in reporting his history?

18   A.        Well, I want to be careful in answering

19   that.  I don't want to give you the idea that a

20   psychiatrist just acts as a passive conduit for

21   what a patient tells them.  A psychiatrist

22   understands that history has inherent distortions

23   just like you will go back to your residence

24   tonight, and you and your colleague will discuss

65

```
 1    what happened here.  I will talk to Miss Glazer's

 2    assistant or I will go home and talk to my wife.

 3    Our accounts might vary and would be different.

 4    Neither one of us would be lying, but they would

 5    be subjective accounts.

 6              History is a subjective account of what

 7    happens.  I took it that way.  What I found was

 8    there were no indications of malingering or no

 9    indications of a tendency to enhance or embellish

10    his degree of suffering.  He didn't use

11    superlatives or hyperbole.  He didn't raise

12    spontaneous concerns about authenticity.  He

13    didn't have any gross distortions in thinking or

14    his account of events.

15              But we have already said several times

16    that I wasn't there and I didn't see what happened

17    with him and the police officers.

18    Q.        Okay.  Did you discuss Joseph Hines'

19    responsibility in relation to the incident?

20    A.        What kind of responsibility are you

21    talking about?

22    Q.        If any.  That is what I'm asking.  Did

23    he or you talk about what, if any, responsibility

24    he had in what occurred?
```

1    A.          Well, let me put it this way:  I will

2    draw your attention to the second paragraph, first

3    full paragraph, on page 2, and he was telling me

4    what happened.  I was taking a history, and he

5    said when the officers passed them, they turned

6    around and came back and asked the group about an

7    empty Four Loko can that was on the ground.  They

8    asked whose it was, and the patient said that it

9    wasn't his, and he said that he didn't know whose

10   it was, but he did acknowledge to me that he, in

11   fact, did know whose it was.  I don't know that he

12   has any obligation to tell the officer whose can

13   it was.  I don't know that he has any obligation

14   or responsibility to disclose that information on

15   casual questioning.

16          Then they asked him for his

17   identification.  He said he had none, even though

18   he acknowledged that he did.  Again, I don't know

19   that he has any responsibility or any obligation

20   to produce identification for a police officer in

21   a casual encounter like this.

22          I know that police officers don't like

23   having citizens respond to them in that manner,

24   and that often heightens their aggressive

67

1    responses, but we did discuss how he saw himself,

2    what he saw that he had to do and what he saw that

3    he didn't have to do.

4    Q.        You are generalizing about officers.

5    You don't know the officers involved in this case

6    or what happened in this situation?

7    A.        Let me be careful in answering that.

8    Although I don't know the officers in this case, I

9    have evaluated over 5,000 police officers over the

10   last 30 years, and I know a lot about police

11   officers as a group, but I don't know these

12   officers.  I haven't had an opportunity to

13   evaluate them.  Miss Glazer hasn't asked me to do

14   so as of yet, but she might.

15            I haven't seen their records or whether

16   they have been the object of other citizens'

17   complaints or other civil suits based on their

18   conduct.

19   Q.        In addition to your mental status

20   examination and the history taking that you have

21   talked about, did you do anything else with Joseph

22   Hines when you were with him?  I don't know if you

23   would do testing or neuropsychological testing or

24   anything like that.  I don't know the answer to

1   that.  I'm just asking.

2   A.          No.  I conducted a psychiatric

3   evaluation that consisted of an interview and a

4   mental status examination.  I took, as we have

5   said several times this evening, I did obtain

6   collateral history from his parents, primarily

7   reviewing the history that he provided to me and

8   asking him if it was consistent with the

9   observations or not, and then I reviewed the

10  documentation that was provided.

11  Q.          Okay.  Now, I just wanted to ask you

12  this:  Did you take into consideration if there

13  was anything that could compromise Joseph Hines'

14  ability to accurately report to you?

15  A.          Well, I don't know about issues of

16  accuracy, but he did say, for example, he was

17  taken to the ground in handcuffs.  That was the

18  last thing he remembered, and then my next

19  sentence is he regained consciousness.  So he

20  didn't have any recollection from the time he was

21  handcuffed and taken to the ground until he

22  woke -- until he regained -- I won't say woke up

23  because we discussed that.  I will say until he

24  regained consciousness and found his eyes were

69

1    swollen shut, his face was bruised and his face

2    was burning.  I don't know if he knew or just

3    inferred that he was maced.

4              But in terms of trying to determine his

5    accuracy, I did look at some of the things we

6    discussed before, whether he had a tendency to

7    embellish his complaints, and I would look at that

8    by whether he over-specified his symptoms, whether

9    he used superlatives and hyperbole, whether he

10   raised spontaneous concerns about the authenticity

11   of his narrative, whether he endorsed the fact

12   that his treating therapists and doctors

13   understood him better than other doctors, and you

14   know, all of those things contribute to my

15   assessment.

16             No psychiatrist is a lie detector, but

17   there were none of the indicators that accompany

18   patients who embellish or distort grossly.

19   Q.        I'm not just talking about embellishing

20   or distorting.  I'm asking the ability to

21   accurately report as well.  Do you understand

22   that?

23   A.        Well, the only impairment that I

24   determined inability to accurately report was the

1    time that he described the lapse of consciousness

2    or the lapse of recollection.

3    Q.          You knew he was drinking alcohol that

4    night, don't you?

5    A.          Yes.  He had a blood alcohol level of

6    .7, which is below the legal limits of

7    intoxication in Michigan.

8    Q.          You that was four hours after the

9    incident occurred?

10   A.          I do.

11   Q.          What would that, based on your

12   knowledge and experience a .07 four hours later

13   can you extrapolate, approximately to what that

14   would mean four hours earlier?

15   A.          It probably would have peaked at .8 or

16   .9.  Alcohol is a zero or metabolism drug.  A

17   certain amount is metabolized per hour rather than

18   a certain percentage of the patient's load.  So

19   that would probably peak at .8 or .9.  Differences

20   would be very moot.

21              Again, the big issue here is that

22   patients who are under the influence of alcohol

23   tend to have greater morbidity when they sustain

24   head injuries than patients who do not.  I

71

```
 1    wouldn't expect a blood alcohol level of point --

 2    what did I say .07?

 3    Q.          .07.

 4    A.          It's confusing because there are two

 5    ways to report that.  That would be .07 or 70.

 6    But even a .10 blood alcohol level wouldn't cause

 7    impaired recollection.

 8    Q.          Okay.  Would it -- let's say that it

 9    was .8 or whatever, .9, you don't know that, I

10    don't know that.  Would that affect his judgment

11    that night?

12    A.          Well, it may.  There is no indication

13    that it would have of necessity, but it might.

14    Q.          Okay.

15    A.          Again, even .1 is really quite low.

16    Q.          Okay.  Your report indicate that he had

17    a few energy drinks laced with alcohol.  Is that

18    what he reported to you, or is that your

19    reporting?

20    A.          I'm looking to see exactly how he

21    described it to me.  He said he had some -- he

22    said the incident occurred at about 10 p.m.  He

23    had some alcohol that was combined with an energy

24    drink.
```

1   Q.          Can you read exactly what it says,

2   because I can't find it, Doctor?

3   A.          Here.  On the bottom of page 1.

4   Q.          Okay.

5   A.          "He and his friends had a few energy

6   drinks laced with alcohol."

7   Q.          Was that his report to you?

8   A.          Yes.

9   Q.          What did you take that to mean?

10  A.          That he took Red Bull or something,

11  something like that, and then they poured some

12  alcoholic beverage in it.

13  Q.          Did he tell you that?

14  A.          I don't have a verbatim transcript.

15  That was my understanding.  Whether it was based

16  on his exact wording or based on my conclusions

17  after discussing it I can't say.

18  Q.          He also indicated to you in here

19  somewhere, and I can't find it, that he was

20  drinking Four Loko.

21  A.          I think the only description of Four

22  Loko was that there was a Four Loko can on the

23  ground, and he said he didn't know whose can it

24  was.  In fact, it belonged to a friend of his.  He

73

1    didn't say that Four Loko was the drink he was

2    drinking.

3    Q.          You don't know if he was or was not

4    drinking Four Loko?

5    A.          I understood that he was drinking an

6    energy drink that had alcohol in it.

7    Q.          You are not sure if it was or wasn't

8    Four Loko?

9    A.          He didn't specify Four Loko.

10   Q.          Are you familiar with Four Loko?

11   A.          No.

12   Q.          No experience or knowledge --

13   A.          No.

14   Q.          -- of Four Loko?

15   A.          Never tasted it.

16   Q.          I'm not just asking you.  Based on your

17   experience in working with people --

18   A.          I don't think we have it up here in

19   Michigan.  We may.

20   Q.          Now, did you also take into

21   consideration, and I'm asking about things that

22   could affect his ability to accurately report to

23   you, and I'm not just talking about making things

24   up or lying or anything like that or embellishing.

```
 1    Did you take into consideration the fact that he

 2    is involved in a lawsuit for which they are

 3    seeking monetary payment?  Did that --

 4    A.         Well, I want to be careful in answering

 5    that question.  I did understand because he was

 6    referred to me by Ms. Glazer that there was a

 7    possibility that this would proceed to litigation.

 8    In talking with him he understood that he didn't

 9    file a lawsuit; his parents had.  I think in

10    talking to his parents I think they were outraged

11    that, at least by their understanding, the police

12    had unnecessarily abused this young man.

13             This man, this young man, was more

14    affected by the fact that he wasn't the same

15    person, he couldn't get things going, and he was

16    haunted by the memories and recollections and

17    reactions by what happened to him.

18             I have seen people.  I have done quite

19    a bit of this work.  I'm a board certified

20    forensic psychiatrist.  I have been at this for a

21    long time.  I have seen some people who come in,

22    in the context of a lawsuit, who have a real chip

23    on their shoulder.  That is, they have a lot of

24    feelings of resentment that they either attempt to
```

1    hide or that they express to varying degrees.  I

2    didn't see that in this young man.

3    Q.          Okay.

4    A.          But I did consider that possibility.

5    Q.          Okay.  And did you take into

6    consideration the possibility --

7    A.          Actually, Four Loko was discovered by

8    three graduates of Ohio State University.

9    Q.          Okay.  Let's not do that now because we

10   are on my time here, so we have got to keep

11   moving.

12   A.          I thought you would be proud.

13   Q.          So did you take into consideration the

14   fact that there -- he had been involved in a

15   criminal matter for which he was found guilty?

16   You were after that I know.  Did you consider his

17   criminal involvement and conviction in any way

18   could possibly affect his ability to accurately

19   report?

20   A.          Well, I want to be careful in answering

21   that.  He was pretty candid with me about the fact

22   that he and his friends were drinking alcohol.  He

23   was candid with me that he knew whose can it was,

24   that when the officer asked him for his

1   identification, he said he had none.  He told me

2   that he had been charged with a number of things

3   and that he -- and that everything was dropped

4   except for a charge of littering, and that he had

5   some assurance that his record would be expunged

6   after a year.

7              In Michigan we have a law called the

8   Holmes Youthful Trainee Act that allows for that.

9   I don't know what you guys do in Ohio.  He told me

10  that when he filed his lawsuit that he refused to

11  expunge his record.  Whether it's criminal or not

12  and the degree of criminality involved I think is

13  a matter of question.

14  Q.         Whether that is true or not, you don't

15  know?

16  A.         As I said, I think it is a matter of

17  question, and it's for the finder of fact.  I did

18  consider this was a police encounter and that this

19  was a young man who didn't fully cooperate with

20  the police.  He didn't give me any indication that

21  he initiated any aggression or any physical

22  approach.

23             Maybe the officers will have a

24  different account, and the finder of fact will

 1   have to consider what their account is, what his

 2   account is, take into account what we are finding

 3   in places like Cleveland and Ferguson about how

 4   the police approach young African-American men.

 5   Those are all for the finder of fact, but I did

 6   consider those issues.

 7   Q.          Did you consider the possible

 8   implications for him when reporting to you for

 9   problems in Ohio State University for drinking

10   under age?

11   A.          Oh my God.  If the university could

12   hold drinking under age against a college student,

13   colleges would be about half of their size in our

14   country.  I think alcohol use is a common

15   experience for college-age youth, for under-age

16   youth.

17              I did consider all that because he told

18   me he had been charged with a number of things,

19   multiple charges, and I don't know if they were

20   resisting arrest or possession, public

21   intoxication or whatever.  But he told me they

22   were all dropped, and it's been my experience that

23   absent any chronic pattern of offense or chronic

24   behavioral difficulties universities trying to be

1    understanding, and they tend to adhere to the

2    principle of diversion.  They are more likely to

3    divert a college student who gets in trouble or

4    who possesses alcohol into some corrective action

5    rather than to take a punitive stance.

6              All that being considered, I did take

7    into consideration the things that he described

8    and the circumstances that he described.

9    Q.        You have no knowledge of OSU's response

10   or implications related to underage drinking for

11   students, do you?

12   A.        I haven't seen their policy

13   specifically.  I would be surprised if they were

14   punitive rather than diversion, but I have been

15   surprised before.

16   Q.        Did you take into consideration his own

17   parental approval as it relates to drinking and

18   being in trouble when you were considering whether

19   or not he did or was able to accurately report?

20   A.        Given the fact that I had an

21   opportunity to talk to his parents and see that

22   they were more understanding than punitive or

23   draconian in their response, but yes, I did

24   consider that maybe he was afraid of his parents

1    finding out what happened or afraid of his parents

2    disapproving of the actions that he took.  That

3    didn't seem to be a factor, but I did consider it.

4    Q.          As part of your evaluation and letter

5    or report, in addition to what you have described

6    what you did with Joseph Hines and your review of

7    the records, you also took a collateral history

8    from the mother and the father?

9    A.          Right.

10   Q.          Did you make any assessment or

11   determination of credibility for either one of

12   them?

13   A.          I didn't find any impairment in their

14   credibility.  They didn't seem -- many parents

15   would say my child wouldn't do anything like that.

16   They didn't seem overprotective or unrealistic.

17   They didn't seem to idealize their child, their

18   young adult child.  They did seem troubled by what

19   happened to him, but I didn't consider it to be

20   inappropriate.

21   Q.          If we could just take a couple minutes

22   and my Co-Counsel and I can talk, I think we might

23   be close.

24              (Recess taken at 6:51 p.m.)

80

```
 1              (Back on the record at 7:00 p.m.)

 2

 3    BY MR. MANGAN:

 4    Q.           Okay.  Doctor, I have a few more

 5    questions I wanted to ask you.

 6    A.           All that time you spent I hope you came

 7    up with something.

 8    Q.           We will see now, won't we?  Have you in

 9    your practice done any research or investigation

10    which related to football-related injuries,

11    concussions?  It's all in the news now.  Have you

12    looked into that as a possible cause for brain

13    injury or concussions or things like that?

14    A.           Well, the kind of repetitive trauma

15    encephalopathy that occurs to football players is

16    something that occurs over a great length of time.

17    It's not common in high school athletes or college

18    athletes.  It's more common -- and we don't see

19    that in people who played sports in high school

20    and college in a limited manner even if they made

21    a college team.

22                 It's more something you see in

23    professional athletes who play well into their

24    adult life and play repeatedly over a span of
```

1   years.  So a young man of age 22, even if he

2   played football in high school and played college

3   football or played soccer and head butted the

4   ball, I wouldn't expect to see the kind of effects

5   that were described in the neuropsychological

6   assessment.

7           Furthermore, it would be very unusual

8   for a football injury, for an athlete wearing a

9   helmet, to have the kind of effect that the facial

10  bruising, retroorbital, retrobulbar hemorrhage

11  would cause, the soft tissue swelling, the

12  lacerations to the eye.  Those speak to more

13  discrete focal trauma in one episode.  So any

14  athletic injuries would pale in comparison to

15  that.

16  Q.      Anything else you considered in

17  relation to football and conclusions or brain

18  injury?

19  A.      Again, I'm not sure what else there is

20  to consider.  I considered the kind of repeated

21  traumatic encephalopathy effects, but again, those

22  don't manifest until 40s or 50s, so that is not

23  consistent with what we are seeing here.

24  Q.      Did you ask or determine whether or not

82

1    Joseph Hines was involved in any athletic

2    activities, whether it be in grade school or high

3    school?

4    A.        I don't have any history of him having

5    been involved in any of that high intensity

6    competitive athletic activities.

7    Q.        Okay.  Now, in your report, Doctor, you

8    talked about past medical history at page 4.

9    A.        I do.

10   Q.        I note that you indicate that he denies

11   the use of street drugs, but he did experiment

12   with marijuana as an adolescent?

13   A.        Yes.

14   Q.        What did you find out about that?

15   A.        That he had a few occasions where he

16   was exposed to marijuana, that his use wasn't

17   compulsive, wasn't regular, wasn't ongoing.

18   Q.        When you say exposed to, you don't mean

19   him being around it; you mean him using?

20   A.        He experimented and used it on a

21   handful of occasions.

22   Q.        He told you on a handful of occasions

23   when?  When he was in high school or college?  Did

24   he tell you?

1   A.          I believe in high school.

2   Q.          Do you know if he ever got in any

3   trouble for the use of marijuana in high school or

4   grade school or college?

5   A.          I don't have any history of that.

6   Q.          He didn't tell you that?

7   A.          Here we go again.

8   Q.          I'm just asking.

9   A.          I have no history.

10  Q.          When you talked to the family and to

11  him, you were given no history of that?

12  A.          That's right.

13  Q.          I don't think we are that far apart.

14  A.          I'm trying to be precise.

15  Q.          Yes, and so am I.

16  A.          But I like the way I say it when I

17  answer the question.  If you have to repeat it

18  using different words, I might not go along with

19  it.

20  Q.          I don't think the record will

21  necessarily reflect that is the way it has been,

22  but we will see.  You also note in there in the

23  personal history he attended Jackson High School,

24  and you give the 3.87 GPA.  Top of the page on

84

1    page 4.

2    A.          Yes, I see.

3    Q.          You also say he was never suspended.

4    A.          That's right.

5    Q.          Would you put that in every report you

6    have of a young man, he was never suspended?  It

7    seemed odd to me, and that is why I'm asking.

8    A.          I pretty much ask everyone.

9    Q.          You ask essentially everybody if they

10   have been suspended from high school, essentially

11   everybody?

12   A.          Well, I found that it's not worth

13   asking kids who go to parochial schools because

14   they don't suspend you in parochial schools.  They

15   kick you out.

16   Q.          So you would include, though, the

17   suspension in there?

18   A.          Yes.

19   Q.          Did he tell you that he had been in any

20   trouble in school short of suspension or towards

21   suspension or any disciplinary matters?

22   A.          I don't recall the specific answers he

23   gave, but I understood that he was generally well

24   behaved.  I didn't take any history of any unusual

85

1   disciplinary encounters short of suspension.

2   Q.          Okay.  And that is why I was asking,

3   because when you put it in there, I was curious to

4   see if there was something short of suspension

5   that occurred.

6   A.          I don't want to say this kid never got

7   a detention.

8   Q.          You were hired by the Fieger law firm

9   in this case?

10  A.          I was.

11  Q.          Is this the first time you have ever

12  been hired by the Fieger law firm?

13  A.          No.

14  Q.          How many times previously have you been

15  hired by them?

16  A.          I don't know.

17  Q.          Any idea?

18  A.          No.  I have been working with

19  Mr. Fieger for many years, and he has called upon

20  me from time to time, but I don't know how many

21  times.

22  Q.          Okay.  I'm going to just try a little

23  bit harder to be precise.  More than 10?

24  A.          Probably.

 1  Q.          More than 20?

 2  A.          Probably.

 3  Q.          More than 40?

 4  A.          Over the last 20 years, yes, sure.

 5  Q.          Let's keep going and see how far we

 6  get.  More than 50?

 7  A.          Probably.

 8  Q.          Okay.  More than 100?

 9  A.          Maybe.

10  Q.          More than 150?

11  A.          Could be.

12  Q.          Okay.  You just don't know?

13  A.          That's right.

14  Q.          But you are not ruling it out?

15  A.          Well, I don't know.  If you are asking

16  me if something is possible, anything is possible.

17  Q.          I think you probably have a pretty good

18  recollection of your career over the last 20

19  years.  I'm just asking is 150 a good ballpark?

20  A.          It might be.  I haven't counted, so I

21  don't know.  It might be.

22  Q.          Okay.  In this case how much were you

23  paid by the Fieger law firm to do the evaluation

24  and the report?

87

1    A.          Usually when I get paid, there is a

2    paid bill in the chart.  I don't see one here.  I

3    haven't been paid yet, but I probably billed

4    around $900 for the report -- for the evaluation,

5    the record review and preparation of the report.

6    Q.          Okay.  Any other money that they would

7    have paid you as part of this?

8    A.          No.  I have not billed anything yet.

9    Q.          You have testified, from what you

10   provided to us -- or not just testified, but have

11   been involved in many cases over your career,

12   correct?

13   A.          Yes.  I have been practicing for almost

14   40 years.

15   Q.          Have you testified as an expert in

16   cases?

17   A.          I have.

18   Q.          Is that primarily what you do when you

19   testify?

20   A.          In cases?

21   Q.          Well, I mean do you do other things in

22   the legal field in addition to --

23   A.          Sure.

24   Q.          Like what?

```
 1   A.          I give opinions on testamentary

 2   capacity, criminal responsibility, damages,

 3   standard of care.  I consult as a forensic

 4   psychiatrist.  I consult to municipalities.  I do

 5   fitness for duty exams for employees.  I'm the

 6   department psychiatrist for the Detroit Police

 7   Department.  I have been for almost 30 years.  So

 8   I see police officers who are involved in firearm

 9   incidents.  I see firefighters.  I do that for

10   other jurisdictions who don't have their own

11   psychiatrist but may have a need.  I consult to

12   insurance companies, disability management

13   companies.  I do all that.

14   Q.          As relates to civil litigation, and I'm

15   going to limit it to that, are you primarily hired

16   by plaintiffs or defendants?

17   A.          I would say when I'm retained, I would

18   say it's about 50/50.  I do work in a hospital.  I

19   have a specialty in brain injury rehabilitation.

20   I have a specialty in chronic pain.  I work in a

21   general hospital and am on the teaching service

22   that provides psychiatric care to medically ill

23   patients or physically ill patients, and so I

24   often am called on to treat people who are injured
```

1    in industrial accidents or motor vehicle

2    accidents.  I treat them and I'm often asked to

3    give testimony in their cases, so I'm not really a

4    plaintiff's witness.  I'm a treating physician.  I

5    would exclude that in the calculations.  My sense

6    is when I'm retained it is about 50/50.

7    Q.         Okay.  I don't know if you are making a

8    distinction between retained and actually

9    testifying.  Are you?  I don't know.

10   A.         Oh, no.  Retained -- well, let me just

11   say that often when I'm retained by the defense,

12   those matters often don't proceed to deposition or

13   they don't proceed to trial.  When I'm retained by

14   plaintiff, they seem to be more likely to proceed

15   to trial.  When an attorney hires me, it's just as

16   likely to be a representative of a plaintiff as a

17   defendant.

18   Q.         The Fieger law firm can you calculate

19   were you retained in a plaintiff's capacity or

20   defendant's capacity in the Fieger cases?

21   A.         It's my understanding that the Fieger

22   firm mostly represents plaintiffs.

23   Q.         So the answer would be, to your

24   knowledge, all or most of your retaining by Fieger

90

1    would be plaintiff oriented?

2    A.          Maybe.  Probably.  I don't know.  I

3    really haven't undertaken a survey or review.

4    Q.          I'm not asking for a survey.  I'm

5    asking for your recollection and knowledge as we

6    sit here today.

7    A.          Yes, maybe.

8    Q.          Okay.  Doctor, I don't have any further

9    questions.  Thank you very much for your time.

10                         - - - - -

11      (The deposition was concluded at 7:10 p.m.

12    Signature of the witness was not requested by

13       counsel for the respective parties hereto.)

14                         - - - - -

15

16

17

18

19

20

21

22

23

24

91

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN)

3                        ) SS

4    COUNTY OF OAKLAND)

5

6             I, Linda S. Wilson, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing

9    questions and answers were recorded by me

10   stenographically and reduced to computer

11   transcription; that this is a true, full and

12   correct transcript of my stenographic notes so

13   taken; and that I am not related to, nor of

14   counsel to, either party nor interested in the

15   event of this cause.

16

17

18                        LINDA S. WILSON, CSR-0973

19                        Notary Public,

20                        Oakland County, Michigan.

21        My Commission expires:  2/24/19.

22

23

24

```
 1                    CERTIFICATE OF NOTARY

 2    STATE OF MICHIGAN   )

 3                            ) SS

 4    COUNTY OF OAKLAND)

 5

 6           I, Linda S. Wilson, certify that this

 7    deposition was taken before me on the date hereinbefore

 8    set forth; that the foregoing questions and answers were

 9    recorded by me stenographically and reduced to computer

10    transcription; that this is a true, full and correct

11    transcript of my stenographic notes so taken; and that I

12    am not related to, nor of counsel to, either party nor

13    interested in the event of this cause.

14

15

16

17

18

19

20

21                    LINDA S. WILSON, CSR-0973

22                    Notary Public,

23                    Oakland County, Michigan.

24    My Commission expires:  2/24/19.
```