IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Joseph Hines,** | : | |
| Plaintiff, | : | Case No. 2:13-cv-1058 |
| v. | : | Judge Graham |
| **Thomas DeWitt, et al.,** | : | Magistrate Judge Jolson |
| Defendants. | : | |

## Opinion & Order

This matter is before the Court on Plaintiff Joseph Hines's petitions for attorneys' fees and costs. (Fee Petition of Goldstein Firm, Doc. 108; Fee Petition of Fieger Firm, Doc. 109). Overbilling began at the beginning when three attorneys met with Hines, charging an aggregate rate peaking at $1550 per hour when all three attorneys were present. Because Hines's petitions for attorneys' fees and costs are replete with similar examples, the fee award will be reduced to a more reasonable amount.

**I.  Background**

In his Amended Complaint, Hines asserted claims against five City of Columbus police officers, alleging, among other things, that they used excessive force when they arrested him. The Court granted summary judgment on some of the claims against some of the officers, and the case ultimately went to trial with three officers remaining as defendants. After a five-day trial, the jury returned a verdict against one of the officers—Defendant Thomas DeWitt—on one of Hines's excessive-force claims. The jury awarded Hines compensatory damages of $30,000 but awarded no punitive damages. Hines's last written settlement offer was $5,000,000; Defendants' last written settlement offer was $10,000.

Hines petitions for fees and costs totaling $91,342.05 to the law firm of David A. Goldstein Co., L.P.A. (the "Goldstein Firm"), located in Columbus, Ohio, and $211,600.43 to the law firm of Fieger, Fieger, Kenney & Harrington, P.C. (the "Fieger Firm"), located in Detroit, Mich-

1

igan, for a total of $302,942.48, more than ten times the jury's damages award. Hines also petitions for pre- and post-judgment interest. Defendant opposes the fee petitions, and he requests, among other things, a reduction in "the attorney's fees request . . . by at least 50%." (Def.'s Mem. in Opp'n at 7, Doc. 110).

## II. Discussion

### A. Attorneys' fees

Generally, litigants in federal court bear their own expenses. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010). But, in a § 1983 action, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee." 42 U.S.C. § 1988(b). A party "prevails" if he "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir. 1978)). Success on "any significant issue in litigation" is a "threshold" easily crossed—and it is crossed here because Hines succeeded on one excessive-force claim. *See id.* So the Court may award a fee, but what is a "reasonable" fee?

The lodestar method—multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate—is the preferred method, and because of its objectivity, "there is a strong presumption that [it] is reasonable." *Perdue*, 559 U.S. at 554. The reasonable number of hours will not include "hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. The reasonable hourly rate should be calculated according to "the 'prevailing market rate[s] in the relevant community.'" *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). In short, the lodestar award is designed to attract competent counsel to vindicate persons' constitutional rights but is not designed to serve as a windfall for attorneys. *Coulter v. Tenn.*, 805 F.2d 146, 149 (6th Cir. 1986).

While the lodestar approach is presumptively reasonable, *Perdue*, 559 U.S. at 554, the trial court can "adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation," *Lavin v. Husted*, 764 F.3d 646, 649 (6th Cir. 2014) (quoting *Adcock-Ladd*, 227 F.3d at 349). Twelve factors guide the Court's analysis of those relevant considerations. *See Johnson v.*

2

*Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).[1] Of these twelve factors, the most important is the degree of success obtained, *Hensley*, 461 U.S. at 436, and it would be an abuse of discretion for the Court to ignore "the relationship between the fees awarded and the results obtained," *Dean v. F.P. Allega Concrete Const. Corp.*, 622 F. App'x 557, 559 (6th Cir. 2015) (citing *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992)).

### 1. Reasonable hourly rates

First, the Court must determine the reasonable hourly rates for the nine attorneys who billed time in this case. Hines requests the following rates and hours:

| **Attorney** (*affiliation*) | **Years of Experience** | **Title** | **Requested Rate** | **Requested Hours** |
|---|---|---|---|---|
| James Harrington, IV (*Fieger*) | 12 | Partner | $500/hour | 263.05 |
| Matthew Klakulak (*Fieger*) | 16 | Associate | $400/hour | 54.5 |
| Heather Glazer (*Fieger*) | 19 | Associate | $350/hour | 49.8 |
| Brandon Abro (*Fieger*) | 2 | Associate | $300/hour | 6.0 |
| Ross Brunetti (*Fieger*) | 5 | Associate | $350/hour | 5.3 |
| Geoffrey Fieger (*Fieger*) | 30 | Named partner | $700/hour | 2.2 |
| Robert Heston (*Fieger*) | Unknown | Unknown | $300/hour | 1.3 |
| David Goldstein (*Goldstein*) | 21 | Partner | $350/hour | 251.9 |
| Romina Newsome (*Goldstein*) | Unknown | Associate | $200/hour | 5.9 |

(Doc. 109 at 2; Doc. 108-1 at 1; Doc. 117-1 at 6). Defendant argues that the rates charged by the Fieger Firm attorneys "are unreasonable and must be reduced to a reasonable amount," but Defendant fails to offer alternative rates. (Def.'s Resp. in Opp'n at 4, Doc. 110).

---

[1] The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19.

The Court derives reasonable hourly rates from assessing the "prevailing market rate[s] in the relevant community." *Adcock-Ladd*, 227 F.3d at 350 (quoting *Blum*, 465 U.S. at 895). For out-of-forum counsel,

> the 'prevailing market rate' is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices, at least where the lawyer's reasonable 'home' rate exceeds the reasonable 'local' charge.

*Id.* Higher, out-of-forum rates are only compensable when it is necessary to hire the out-of-forum attorney. *See id.* In general, the prevailing market rate is different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region. *Id.* Even a well-renowned lawyer who commands fees well in excess of the prevailing market rate will be paid at the prevailing market rate. *Coulter*, 805 F.2d at 149. In short, hourly rates for fee awards should not exceed the local market rates necessary to encourage competent lawyers to undertake the representation in question. *Adcock-Ladd*, 227 F.3d at 350.

Here, the reasonable hourly rates are those which competent counsel command in this Court's local market: Columbus, Ohio. But neither party has submitted evidence of what the local market rates are anywhere in Ohio. Hines only submitted evidence of what the prevailing market rates are for Michigan and Washington, D.C. No matter: when determining prevailing market rates, "[a] district court may rely on a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 499 (6th Cir. 2011). The Court takes judicial notice of the most recent Ohio State Bar Association Report as evidence of prevailing local market rates. Fed. R. Evid. 201(c)(1)[2]; *see* Ohio State Bar Ass'n, *The Economics of Law Practice in Ohio in 2013*, available at https://www.ohiobar.org/NewsAndPublications/Documents/OSBA_EconOfLawPracticeOhio.pdf (hereinafter, "OSBA Report") (containing reported rates for attorneys broken down by practice area, region, and years of experience, among other categories). The Court may also consider an attorney's own normal billing rates to help calculate a reasonable fee. *See Hadix v. Johnson*, 65 F.3d 532, 536 (6th Cir. 1995).

---

[2] Even though the Ohio State Bar Association report is not in the record, the Court can take judicial notice of it as a published market survey. *See Stewart v. Rhodes*, 656 F.2d 1216, 1221 (6th Cir. 1981) (taking judicial notice of two bar association reports pursuant to Federal Rule of Evidence 201); *In re Oglesby*, No. 13-32362, 2015 WL 5145571, at *2 (Bankr. N.D. Ohio Aug. 28, 2015) (taking judicial notice of bar association report).

Defendant does not challenge the hourly rates charged by the Goldstein Firm. Mr. Goldstein, the named attorney with that firm, has practiced law for more than 20 years. (Goldstein Fee Petition at 5). His requested rate is identical to the median billing rate for civil-rights attorneys in Ohio[3] and between the median and 75th percentile for all attorneys in downtown Columbus. (OSBA Report at 40). Because Defendant does not object to his requested rate, and the Court finds Mr. Goldstein's rate to be similar to the prevailing market rate for similarly experienced attorneys, the Court will award Mr. Goldstein his requested rate of $350 per hour.

Defendant challenges the rates requested by the Fieger Firm. Beginning with Mr. Harrington, the Court finds that the rates requested by the Fieger Firm are unreasonable. Mr. Harrington has practiced law for twelve years, eight fewer than Mr. Goldstein. Mr. Harrington's requested rate of $500 per hour places him at the upper quartile of civil-rights attorneys in Ohio, at a rate far in excess of a typical partner in a firm with 2-7 partners, and in the 95th percentile for all attorneys in downtown Columbus. (OSBA Report at 40). Based on the Court's own knowledge and experience, the OSBA Report, and the Court's impression of Mr. Harrington's work in this case, the Court will award him an hourly rate of $350 per hour.

Mr. Harrington objects to lowering his requested rate. He argues that his request is in line with the rates described in his submitted materials: two reports of attorneys' fees—one from Michigan and the other from Washington, D.C. He also argues that the Fieger Firm should receive unusually high rates because of its renown due to its history of litigation success. Neither argument is persuasive.

First, in support of his $500-per-hour request, Mr. Harrington provides the "Laffey Matrix," an annually adjusted chart of attorneys' hourly rates in Washington, D.C. The *Laffey* Matrix germinates from an attorney's-fee dispute in federal district court in Washington D.C. *See Laffey v. Nw. Airlines, Inc.*, 572 F. Supp. 354, 374–75 (D.D.C. 1983) *aff'd in part, rev'd in part*, 746 F.2d 4 (D.C. Cir. 1984) (finding rates to be "generous," but within prevailing market rates for the Washington, D.C. area for attorneys with extraordinary experience and expertise). But the *Laffey* Matrix is poor evidence of reasonable rates outside of Washington, D.C. *See Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010) ("[J]ust because the *Laffey* matrix has been accepted in the District of Columbia does not mean that it is a sound basis for determin-

---

[3] Admittedly, the N value in the OSBA Report ideally would be greater, as it reflects only 13 civil-rights attorneys reporting. (OSBA Report at 40).

ing rates elsewhere, let alone in a legal market 3,000 miles away. It is questionable whether the matrix is a reliable measure of rates even in Alexandria, Virginia, just across the river from the nation's capital."). The Court finds that the *Laffey* Matrix is poor evidence of reasonable rates in the relevant local market in this case, especially since its rates conflict with those reported by the OSBA Report—a source of local data.

Second, Mr. Harrington argues that the Fieger Firm's requested hourly rates are reasonable, in part, because of the firm's historical success and renown. (Fieger Fee Petition at 10; Pl.'s Reply at 3–4, Doc. 112). But when awarding statutory attorneys' fees, attorneys are not compensated above market rates due to renown. *Coulter*, 805 F.2d at 149 ("[A] renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate."). The fee should not exceed the market rates necessary to encourage competent lawyers to undertake the representation in question. *Id.* $350 per hour is the median rate for civil-rights attorneys in Ohio, and the Court is confident that the median attorney in that survey would be competent to undertake this litigation. The Court will not inflate the fee award based on the Fieger Firm's renown or historical success.

Because there was no need for out-of-forum counsel, and in that circumstance there exists no basis to inflate a fee award to reflect counsel's home rates, and because renown alone is not compensable under federal fee-shifting statutes, there exists no basis to award fees above the rates reported by the OSBA Report and requested by local counsel, Mr. Goldstein.

The remaining attorneys are all associates,[4] and their rates will reflect the rates reported in the OSBA Report for associate attorneys of commensurate experience. Based on the OSBA Report[5] and the Court's impression of the quality of work of each of the attorneys, the Court will award the following hourly rates:

| **Attorney** (*affiliation*) | **Years of Experience** | **Title** | **Requested Rate** | **Awarded Rate** |
|---|---|---|---|---|
| James Harrington, IV (*Fieger*) | 12 | Partner | $500/hour | $350/hour |
| Matthew Klakulak (*Fieger*) | 16 | Associate | $400/hour | $250/hour |

---

[4] Mr. Fieger, a named partner who requested a rate of $700 per hour, is not discussed in this section because all of his 2.2 hours billed will be disallowed as unreasonable.

[5] The OSBA Report includes a chart of associate billing rates from which the Court draws the reasonable rates for each associate attorney. (OSBA Report at 41).

| | | | | |
|---|---|---|---|---|
| Heather Glazer (*Fieger*) | 19 | Associate | $350/hour | $300/hour |
| Brandon Abro (*Fieger*) | 2 | Associate | $300/hour | $150/hour |
| Ross Brunetti (*Fieger*) | 5 | Associate | $350/hour | $200/hour |
| Robert Heston (*Fieger*) | Unknown | Unknown | $300/hour | $150/hour |
| David Goldstein (*Goldstein*) | 21 | Partner | $350/hour | $350/hour |
| Romina Newsome (*Goldstein*) | Unknown | Associate | $200/hour | $200/hour |

### 2. Reasonable hours billed

The second half of the lodestar approach requires the Court to determine "the reasonable number of hours expended." *Hensley*, 461 U.S. at 449. The Court is tasked with "exclud[ing] from this initial fee calculation hours that were not "'reasonably expended.'" *Id.* at 434 (quoting S. Rep. No. 94–1011 at 6 (1976)). But the prevailing party's lawyer should be the first gatekeeper in this task, exercising the same billing judgment she would with one's client. *Id.* "Counsel for the prevailing party should make a good faith effort to exclude from the fee request hours that are excessive, redundant, or otherwise unnecessary . . . ." *Id.* The Court's focus is on "mixed questions about whether the lawyer used poor judgment in spending too many hours on some part of the case or by unnecessarily duplicating the work of co-counsel." *Coulter*, 805 F.2d at 151. And while "multiple representation can be productive," *id.* at 152 (citing reasoning of district court judge in awarding fees to co-counsel), "the danger of duplication [is] a waste of resources which is difficult to measure," *Id.*

The Fieger Firm's billing statements contain examples of excessive, redundant, or otherwise unnecessary billing. While serious and pervasive duplication problems may merit an across-the-board reduction, *see id.*, here the Court has identified specific instances of unreasonable hours billed and will reduce the hours awarded accordingly.

### i. Reductions in unreasonable, excessive, or duplicative hours

12/5/12 – Three attorneys from the Fieger firm attended the initial meeting with Mr. Hines, which was unnecessary and excessive. The Court approves the time of only Mr. Harrington for this meeting. (Reduction of 2.75 hours from Ms. Glazer's time; reduction of 0.75 hours from Mr. Fieger's time).

7

5/8/13 – Ms. Glazer and Mr. Harrington both attended "Meeting Regarding Representation" with Mr. Hines and his parents. The presence of both attorneys was unnecessary. The Court approves the time of only Mr. Harrington for this meeting. (Reduction of 2 hours from Ms. Glazer's time).

1/12/15 – Ms. Glazer billed 2.5 hours for preparation and 6.5 hours for her telephonic attendance at a series of depositions taken by Mr. Goldstein. Ms. Glazer does not assert that she contributed in any way to the depositions, and her billing statement asserts as much: that she telephonically *attended* the depositions. And while part of the 2.5 hours of deposition preparation could be attributed to depositions that she did contribute to or take herself, by block billing the time, she obfuscated any potentially compensable time. The Fieger Firm argues that her attendance was necessary because "the Fieger Firm was lead counsel on the case and needed to be kept abreast of the important developments in the case." (Pl.'s Reply at 7, Doc. 112). This could have been accomplished in little time, and no doubt was accomplished through the many billed calls and email communications between the attorneys. Ms. Glazer's time devoted to the deposition was excessive and unreasonable. (Reduction of 9 hours from Ms. Glazer's time).

1/19/15 – Similarly, Mr. Harrington's preparation time for a deposition that he did not take was unreasonable. (Reduction of 1.5 hours from Mr. Harrington's time).

6/4/15 – 6/12/15 – Mr. Harrington's time devoted to the Final Pretrial Conference was excessive and unreasonable. Mr. Goldstein had done much of the work in the case until this point and was better prepared to most efficiently handle the Final Pretrial Conference due to his involvement in discovery. (Reduction of 17.5 hours from Mr. Harrington's time).

6/14/15 – Mr. Harrington spent .5 hours reviewing Facebook posts regarding his client's case, which is information that was immaterial to the trial of the case. This work was thus unnecessary.  (Reduction of 0.5 hours from Mr. Harrington's time).

7/15/15 – 9/22/15 – Mr. Fieger did not participate in the litigation of this matter. His only contributions were internal strategy meetings with Mr. Harrington, a Fieger Firm partner who requests $500 per hour for his time. These "strategy meetings," for which the Fieger Firm would bill an aggregate of $1200 per hour, are unreasonable. (Reduction of 1.45 hours from Mr. Fieger's time).

9/11/15 – 9/12/15 – Mr. Harrington spent 4.5 hours preparing for and meeting with Hines and his parents (non-parties) to discuss the case. While counsel have a duty to communicate with

their clients, *see* Ohio Prof. Cond. Rule 1.4 (Communication); Michigan Prof. Cond. Rule 1.4 (Communication), 4.5 hours to prepare for and discuss a case in which communications with the client were ongoing is excessive. (Reduction of 2.25 hours from Mr. Harrington's time).

9/14/15 – 9/26/15 – Mr. Harrington's trial preparation was excessive, possibly the result of his lack of involvement in the case until after the summary-judgment stage. Because of this inefficiency, an inefficiency not likely tolerated by a paying client, the Court will reduce the number of hours spent on trial preparation by 75%. Mr. Harrington billed 85.75 hours on "Trial Preparation." The Court will allow 21.4 hours. (Reduction of 64.35 hours from Mr. Harrington's time).

9/17/15 – 9/18/15 – All charges related to Plaintiff's "Motion for Voluntary Dismissal Pursuant to Fed. R. Civ. P. 41(a)(2) or in the Alternative a Continuance of the Trial," (Doc. 94), are unreasonable because this Motion was filed due to a personal issue of counsel. A paying client would not pay for these charges and neither should Defendant. (Reduction of 2.4 hours from Mr. Harrington's time).

10/5/15 – 10/12/15 – Mr. Harrington and Mr. Goldstein's time spent preparing the fee petitions will be considered separately. (Reduction of 29 hours from Mr. Harrington's time; reduction of 1.3 hours from Mr. Goldstein's time).

Various – Mr. Harrington and Ms. Glazer bill .1 or .2 hours for many administrative actions, such as "Receipt and Review of Notice of filing deposition." These entries are unreasonable as the notices in many cases are one sentence long, hardly content that takes 6 minutes to access and read. Not attempting to achieve "auditing perfection," the Court will do "rough justice" and reduce each attorney's bill by 1 hour. *Fox v. Vice*, 563 U.S. 826, 131 S. Ct. 2205, 2216 (2011). (Reduction of 1 hour from Mr. Harrington; reduction of 1 hour from Ms. Glazer's time).

### ii. Travel billed at full hourly rate

There is no clear rule in the Sixth Circuit as to whether and to what degree travel time is compensable. *Disabled Patriots of Am., Inc. v. Beverly Terrace, Ltd.*, No. 1:06-CV-3063, 2008 WL 4426344, at *4 (N.D. Ohio Sept. 25, 2008). What is clear is that whether travel time should be billed at the usual rate—or compensated at all—is "within the discretion given the district court." *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991). Other circuits are split on the subject. *Compare Johnson v. Credit Int'l, Inc.*, 257 F. App'x 8, 10 (9th Cir. 2007) (vacating the denial of fees and costs for travel and remanding for further consideration); *with Interfaith Cmty. Org. v.*

9

*Honeywell Int'l, Inc.*, 426 F.3d 694, 710 (3d Cir. 2005), *as amended* (Nov. 10, 2005) ("[U]nder normal circumstances, a party that hires counsel from outside the forum of the litigation may not be compensated for travel time . . . ."). Other courts only allow travel expenses when "local counsel could not have rendered the service involved and thereby obviated the necessity of employing an attorney who incurs costs traveling from home to the work site." *Anderson v. Wilson*, 357 F. Supp. 2d 991, 1000 (E.D. Ky. 2005) (quoting *In re Segal,* 145 F.3d 1348, 1353 (D.C. Cir. 1998)) (internal quotation marks omitted).

In the exercise of the Court's discretion, out-of-forum counsel's travel time will be disallowed. His time entries for "Travel" that include conference calls that are otherwise billable are permitted. Following *Anderson*, because local counsel, Mr. Goldstein, could have tried this case—he did most of the work in discovery and examined witnesses at trial—out-of-forum counsel was unnecessary. Therefore, the Court will not allow Mr. Harrington's time billed for travel to and from Columbus. (Reduction of 17.5 hours from Mr. Harrington's time).

The Court will award the following rates and hours to calculate the lodestar:

| **Attorney** (*affiliation*) | **Requested rate** | **Requested hours** | **Awarded rate** | **Awarded hours** | **Lodestar award** |
|---|---|---|---|---|---|
| James Harrington, IV (*Fieger*) | $500/hour | 263.05 | $350 | 143.8 | $50,330.00 |
| Matthew Klakulak (*Fieger*) | $400/hour | 54.5 | $250 | 54.5 | $13,625.00 |
| Heather Glazer (*Fieger*) | $350/hour | 49.8 | $300 | 35.05 | $10,515.00 |
| Brandon Abro (*Fieger*) | $300/hour | 6 | $150 | 6 | $900.00 |
| Ross Brunetti (*Fieger*) | $350/hour | 5.3 | $200 | 5.3 | $1,060.00 |
| Geoffrey Fieger (*Fieger*) | $700/hour | 2.2 | *** | 0 | $0.00 |
| Robert Heston (*Fieger*) | $300/hour | 1.3 | $200 | 1.3 | $260.00 |
| David Goldstein (*Goldstein*) | $350/hour | 251.94 | $350 | 250.64 | $87,724.00 |
| Romina Newsome (*Goldstein*) | $200/hour | 5.9 | $200 | 5.9 | $1,180.00 |
| TOTALS | | 639.99 | | 502.49 | $165,594.00 |

**Fieger Firm Subtotal: $76,690.00**

**Goldstein Firm Subtotal: $88,904.00**

### 3. Degree of success

Calculating the lodestar number "does not end the inquiry." *Hensley*, 461 U.S. at 464. The lodestar number may be modified upward or downward based on twelve factors, the most

important of which is the results obtained. *Id.* at 434. "[T]wo questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* And while "[t]here is no precise rule or formula in making these determinations," the degree of success obtained is "the most critical factor." *Id.* at 436.

When analyzing the degree of success in the context of a lawsuit where it is "difficult to divide the hours expended on a claim-by-claim basis. . . . the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435. "'[T]he amount of damages awarded as compared to the amount sought' in a damages claim is one way to think about the degree of success." *McKelvey v. Sec'y of U.S. Army*, 768 F.3d 491, 495 (6th Cir. 2014) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). "Few, if any, reasonable litigants would call a monetary judgment that comes in well under the money offered to settle the case a success." *Id.* To this end, district courts may consider spurned settlement offers as "one factor" when considering the degree of success. *See id.* (discussing refusals of reasonable settlement offers). The analysis of the degree of success starts with the two *Hensley* questions.

First, "did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?" *Hensley*, 461 U.S. at 434. Yes. Hines brought excessive-force claims against five City of Columbus police officers in his Amended Complaint. (Am. Compl. at 4–6, Doc. 20). The Court dismissed the claims against two of the officers. (Op. & Order on Mot. for Summ. J. at 13–18, Doc. 58 (holding that under the circumstances, use of a "hobble strap" did not constitute excessive force)). Plaintiff also brought § 1983 conspiracy claims against all Defendants, and on those claims the Court granted summary judgment to all Defendants. (*Id.* at 19–20). Plaintiff also brought failure-to-intervene claims against three officers, and the Court dismissed a failure-to-intervene claim as to one of the officers. (*Id.* at 18).

Some of these claims turned on distinct legal and factual issues—the hobble-strap claim against two of the officers, for example—but it is difficult to divide the hours expended between the various claims since the billing statements do not distinguish between the claims in any meaningful way. For example, Hines's counsel billed for work on the response to Defendants' Motion for Summary Judgment but did not divide the hours expended between the various

11

claims and Defendants. (Pl.'s Ex. E-1, Itemization of Associate Attorney Time – Matthew Klakulak at PAGEID 1798, Doc. 109-5). The billing for the depositions of the five officers serves as another example—the depositions all took place on the same day and are billed in a single block. (Goldstein Timesheet at 4, Doc. 117-1). Because it is "difficult to divide the hours expended on a claim-by-claim basis. . . . the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435. The Court remains, however, mindful that Hines succeeded on only one of his many claims.

The significance of the overall relief obtained by Hines was slight in relation to the hours expended on the litigation. For example, Hines brought claims for excessive force, failure to intervene, and conspiracy, but the jury found for him on only one claim of excessive force against only one of the officers. The significance of this relief pales in comparison to the hours expended. This is illustrated in concrete terms by the parties' settlement discussions.

In a telephone conference on March 11, 2016, the attorneys for Plaintiff and Defendants informed the Court of the parties' last written settlement offers: Hines's last offer was $5,000,000; Defendants' last offer was $10,000. With a chasm of $4,990,000 fixed between the parties, they exchanged no more written offers to settle. If they had, the Court believes that Hines would have received a settlement equal to or perhaps even greater than the jury's award. The jury's verdict was not a huge success—Hines received 0.6% of what he asked for, prevailed on only one of his many claims against only one of the five officers he sued, and his attorneys are requesting attorneys' fees and costs totaling more than ten times what Hines received in damages.

The Court "should award only that amount of fees that is reasonable in relation to the results obtained." *Hensley*, 461 U.S. at 440. An adjustment due to lack of success usually takes the form of an across-the-board reduction of some percentage of the lodestar. *See, e.g.*, *Ky. Rest. Concepts Inc. v. City of Louisville*, 117 F. App'x 415, 422 (6th Cir. 2004) (affirming 35% reduction for partial success); *Snide v. Disc. Drug Mart, Inc.*, No. 1:11-CV-00244, 2013 WL 6145130, at *11 (N.D. Ohio Nov. 21, 2013) (50% reduction to lodestar due to limited success); *but see Ohio Right to Life Soc., Inc. v. Ohio Elections Comm'n*, 590 F. App'x 597, 605 (6th Cir. 2014) ("[T]he district court abused its discretion in reducing Plaintiff's requested hours by 85%."). In *Ohio Right to Life*, the Sixth Circuit reviewed an 85% reduction that was based on limited success, failure to properly exercise billing judgment, and inadequate documentation. *Id.* at 603. The

Sixth Circuit expressed a threefold concern with the "aberrational reduction" of 85% of attorneys' fee award. *Id.* at 604. First: the court held that an 85% reduction would "discourage[] attorneys from representing clients in civil rights actions for fear their fees will be dramatically reduced by the court." *Id.* at 604. Second: such large reductions are rare and require more clear justification than the district court provided *Id.* at 604. Third: the court could not determine how much of the reduction was due to each of the three reasons given by the district court. *Id.* at 605 (stating that the Sixth Circuit had no disambiguation requirement, but since disambiguation would "facilitate the appellate court's review," failure to do so amounted to an abuse of discretion).

While Hines has vindicated an important Constitutional right, he achieved only a sliver of the monetary success he sought and only slightly more than Defendant offered to settle the case. The degree of success in this case was minimal, and the trial was probably unnecessary. Because of these factors, the Court will reduce the lodestar by 50%.

**Fieger Firm Subtotal: $76,690.00 x 0.5 = $38,345.00**

**Goldstein Firm Subtotal: $88,904.00 x 0.5 = $44,542.00**

### B. Fees for fees

The Court may also award fees for "time spent in preparing, presenting, and trying attorney fee applications." *Coulter*, 805 F.2d at 151. Absent unusual circumstances, the number of compensable hours for preparing and successfully litigating a fee petition should not exceed 3% of the hours in the main case. *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 620 (6th Cir. 2007); *see also Coulter*, 805 F.2d at 151 ("[T]he hours allowed for preparing and litigating the attorney fee case should not exceed 3% of the hours in the main case when the issue is submitted on the papers without a trial . . . .").

The Court allowed 502.49 hours in the main case; 3% of this is 15.1 hours. The Fieger Firm's bill of 37 hours is excessive and unreasonable, especially in light of the 1.3 hours billed by Mr. Goldstein to do similar work.[6] Furthermore, considering Mr. Harrington's representation about the Fieger Firm's work—that they are experienced in litigating § 1983 claims, (Harrington Aff. at ¶ 3, Doc. 109-1)—the Court does not believe that the Fieger firm needed to create from scratch the petition, affidavits, or reply brief. In summary, comparison and common sense dictate

---

[6] Attorneys from the Fieger Firm spent 37 hours preparing the fee petition and the reply brief: Mr. Harrington spent 29 hours preparing the petition; Mr. Klakulak spent 8 hours preparing the reply brief. Mr. Goldstein billed 1.3 hours to prepare his firm's petition and did not submit a billing statement for his work on his reply brief.

that the Fieger Firm's request for 37 hours to prepare and brief the petition is excessive; the Sixth Circuit dictates that it is above the allowable limit. *See Coulter*, 805 F.2d at 151; *Gonter*, 510 F.3d at 620. Therefore, the Court will award 2% of the lodestar award to the Fieger Firm and award the Goldstein Firm's requested amount: $1533.80 in "fees-for-fees" to the Fieger Firm, and $455.00 in "fees-for-fees" to the Goldstein Firm.

**Fieger Firm Subtotal: $38,345.00 + $1,533.80 = $39,878.80**

**Goldstein Firm Subtotal: $44,542.00 + 455.00 = $44,997.00**

### C. Prejudgment interest

If no statutory command to award prejudgment interest exists, an award of prejudgment interest is within the sound discretion of the trial court. *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988, 990 (6th Cir. 1982). The parties agree that when deciding whether to award prejudgment interest for cases brought under § 1983, Ohio law applies. *See Molton v. City of Cleveland*, 839 F.2d 240, 250 (6th Cir. 1988) ("Prejudgment interest available on a state claim through Ohio Rev. Code § 1343.03(C) . . . .") (citing *Bass v. Cleveland Clinic Found.*, No. 51730, 1987 WL 6555, at *2 (Ohio Ct. App. Feb. 12, 1987)). The parties only dispute whether an award of prejudgment interest is proper under the statute, so the Court decides only that dispute, expressing no opinion about the propriety of following the Ohio Revised Code to decide whether prejudgment interest is proper on a federal constitutional claim.

> The Ohio Revised Code provides that prejudgment interest is available:
>
> If, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case . . . .

Ohio Rev. Code § 1343.03(C)(1). Prejudgment interest is a reward for a party who attempted to settle a case with a recalcitrant opponent. The question, then, is whether the party that ultimately lost made a good faith effort to settle the case.

> A party has not "failed to make a good faith effort to settle" under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith,

objectively reasonable belief that he has no liability, he need not make a monetary settlement offer.

*Kalain v. Smith*, 25 Ohio St. 3d 157, 159, 495 N.E.2d 572, 574 (1986).

Here, Hines accuses Defendant of failing to make a good faith effort to settle. His accusation trips at the starting line: Defendant fully cooperated throughout discovery, his evaluation of his risk and potential liability was rational as can be inferred from a comparison of his settlement offer and the jury's award, he never attempted to delay the proceedings, and he (more so than Hines) engaged in good-faith settlement negotiations. During settlement negotiations, Defendant's position was the more sober assessment of the risks of litigation, and as such, the Court finds that Defendant made a good faith effort to settle the case; therefore, Hines is not entitled to prejudgment interest.[7]

### D. Costs

#### 1. Expert-witness fees

In the Fieger Firm's petition is a request for expert-witness fees, a part of the petition Defendant opposes, arguing that such fees are not recoverable absent specific statutory authority, and no such authority exists. Plaintiff relies on § 1988: "In awarding an attorney's fee under subsection (b) of this section in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee." 42 U.S.C. § 1988(c). But this case is not an action to enforce any provision of § 1981 or § 1981a of Title 42; it is an action to enforce 42 U.S.C. § 1983. Therefore, expert-witness fees are not recoverable.

The Court should only shift expert-witness fees when there exists "explicit statutory authority" to do so. *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987). The language of § 1988(c) does not contain explicit statutory authority to shift expert-witness fees in § 1983 actions. *H.D.V.-Greektown, L.L.C. v. Detroit, City of*, No. 06-11282, 2015 WL 1530353, at *13 (E.D. Mich. Mar. 31, 2015) (collecting cases from district courts in New York, Nebraska, Oregon, California, and Arizona), *appeal docketed*, No. 15-1449 (6th Cir. April 21, 2015); *Ruff v. Cnty. of Kings*, 700 F. Supp. 2d 1225, 1243 (E.D. Cal. 2010) ("[C]ases are uniform that Sec-

---

[7] Section 1343.03(C)(1) requires the Court to make a lack-of-good-faith-effort determination "at a hearing held subsequent to the verdict." *Id.* The language of the statute does not require the inverse, that is, the Court to hold a hearing to find that the paying party *did* make a good faith effort to settle the case. So, the Court will not do so. In any event, the Court did hold a telephone conference to discuss these issues. That conference was sufficient to satisfy the requirement of a hearing and neither party has requested any additional hearings.

tion 1988(c) does not apply to a Section 1983 action . . . ."). The United States Code does elsewhere provide the explicit authority to award expert-witness fees. *See, e.g.*, 42 U.S.C. § 2000e-5 ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs . . . .") (enforcing equal-employment law); 29 U.S.C. § 2617(a)(3) ("The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant.") (Family and Medical Leave Act). Congress has not provided the explicit statutory authority to shift expert-witness fees under § 1988.

The history of § 1988 supports this conclusion. The Supreme Court held, in 1991, that § 1988's provision for a "reasonable attorney's fee" did not include expert-witness fees because Congress did not explicitly provide that authority. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101–02 (March 19, 1991) ("[W]e conclude that § 1988 conveys no authority to shift expert fees."). Later that year, Congress added to § 1988 subsection (c), which responded to *Casey* and provides for expert-witness fees in actions enforcing § 1981 or § 1981a. *See* 42 U.S.C. § 1988(c) (amended November 21, 1991); *Landgraf v. USI Film Products*, 511 U.S. 244, 251 (1994) (recognizing that amendment to § 1988 was response to *Casey*).

Hines cites three cases in support of his position—that expert-witness fees are recoverable under § 1988. *See SapaNajin v. Gunter,* 857 F.2d 463, 465 (8th Cir. 1988) (awarding $100 in expert-witness fees); *Hillburn v. Comm'r of Conn. Dep't of Income Maintenance*, 683 F. Supp. 23, 27 (D. Conn. 1987) (awarding $150 per hour in expert-witness fees); *United States v. Yonkers Bd. of Educ.*, 118 F.R.D. 326, 330 (S.D.N.Y. 1987) (refusing to apply $30-per-day limit on expert-witness fees in trial that took over 80 days). But all these cases predate Congress's addition of the expert-fee provision in § 1988 that only provides expert-witness fees for § 1981 and § 1981a actions. None of these cases persuade the Court that Congress enacted explicit statutory authority for a § 1983 plaintiff to recover expert-witness fees. Therefore, Hines's request of $13,034.60 for expert-witness fees is denied.

### 2. Assorted Costs

Defendant requests that Hines's costs be reduced by 75%, specifically citing "the Fieger Firm's extraordinarily high copying rates, legal research amounts, [and] telephone charges." (Def.'s Resp. in Opp'n at 10, Doc. 110). Defendant cites the disparity in the rates of the two firms that represented Hines as an example of the unreasonableness of the Fieger Firm's rates.

The Fieger Firm responds that its bill of costs is captured through an automated system and is therefore accurate.

"[Section] 1988 allows district courts to award 'those incidental and necessary expenses incurred in furnishing effective and competent representation.'" *Ohio Right to Life*, 590 F. App'x, at 605 (quoting *Waldo v. Consumers Energy Co.,* 726 F.3d 802, 827 (6th Cir. 2013)). Those expenses include "[r]easonable photocopying, paralegal expenses, and travel and telephone costs." *Id.* (alteration in original) (quoting *Waldo*, 726 F.3d at 827). District courts have denied requests for fees and expenses when they appear excessive and their accompanying documentation is inadequate. *See, e.g.*, *id.* at 605–06 ("Plaintiff's requested expenses take the form of statements such as 'Computer Research,' 'Delivery Fee,' and 'Document Reproduction' without further explanation.")

The Fieger Firm submitted a bill of costs accompanied by an affidavit describing its cost recovery system—every expense is routed to a particular account via a client number. Additionally, each item of document reproduction is accompanied by a description and a date, the combination of which substantiates each cost as one incidental to representation in this case. *See id.* at 605. So while the accompanying documentation to the bill of costs is adequate, some of the costs appear excessive. For example, $158 for three phone calls from Michigan to Columbus is excessive, and the Fieger Firm's rates for document reproduction are excessive. (Pl.'s Ex. H, Bill of Costs of Fieger Firm at 19, Doc. 109-8 (charging $920 to reproduce exhibits before trial)). In total, the Fieger Firm billed more than $8,000 in phone and copying costs alone—this was excessive.

Defendant does not dispute the necessity of legal-research costs, only that the Fieger Firm's rates for those costs are excessive. The Sixth Circuit has yet to squarely address whether legal-research costs are recoverable. *See Auto Alliance Int'l, Inc. v. U.S. Customs Serv.*, 155 F. App'x 226, 229 (6th Cir. 2005) ("[W]e need not address the merits of the issue."); *see also Howe v. City of Akron*, 2016 WL 916701, at *20 (N.D. Ohio, March 10, 2016) (noting Sixth Circuit's silence on the subject), *appeal docketed*, No. 16-3368 (6th Cir. April 14, 2016). The Fieger Firms's legal-research costs are not unreasonable per se.

The Court earlier held that Mr. Harrington's billed time for travel was not recoverable, and the same applies to his travel costs of $695.76. *See supra* at 9–10.

The Court will specifically disallow all expert-witness fees and travel expenses for out-of-town counsel. The Court will apply a 40% reduction to the Fieger Firm's remaining bill of costs. No similar reduction is warranted for the Goldstein Firm's bill of costs. The Court will therefore award $13,077.04 in costs attributed to the Fieger Firm and $1,982.05 in costs attributed to the Goldstein Firm.

### E.  To whom the fees are awarded

At a telephone conference in this case, the Fieger Firm represented that two-thirds of any fee award it might receive would go to its client, Mr. Hines. Mr. Goldstein understood this differently—that any award of attorneys' fees would be paid to the attorneys.

Section 1988's fee-shifting provision awards fees to "prevailing part[ies]," not prevailing parties' attorneys. *Astrue v. Ratliff*, 560 U.S. 586, 598 (2010) ("[T]he party, rather than the lawyer is entitle[d] to receive the fees under § 1988(b) . . . .") (citations omitted) (internal quotation marks omitted) (quoting *Venegas v. Mitchell*, 495 U.S. 82, 87–88 (1990)). In fact, it would be reversible error for the Court to direct Defendant to pay the attorneys' fee award to the attorneys rather than to Hines himself. *See Ohio Right to Life*, 590 F. App'x at 606. Therefore, Defendant is directed to pay Mr. Hines the full amount of this Court's award of attorneys' fees and costs; what Hines does with the money is a matter of his contract with his attorneys.

## III.  Conclusion

Hines's petitions are GRANTED IN PART AND DENIED IN PART. (Docs. 108, 109). Defendant is ordered to pay $99,934.89 in attorneys' fees and costs to Hines with $44,997.00 in attorneys' fees and $1,982.05 in costs attributed to the Goldstein Firm and $39,878.80 in attorneys' fees and $13,077.04 in costs attributed to the Fieger Firm. No prejudgment interest is awarded.

IT IS SO ORDERED.

                                          s/ James L. Graham
                                          JAMES L. GRAHAM
                                          United States District Judge

DATE:  May 4, 2016